**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| JONATHAN GIBBS, SUSAN HART, JACOB LEHMAN, ANNETTE A. ROBBINS, ARTHUR SPROGIS, and PAMELA YANGO, individually and on behalf of all others similarly situated, | Case No. _____ <br><br> <u>CLASS ACTION</u> <br><br> JURY TRIAL DEMANDED |
| Plaintiffs, | |
| v. | |
| THE HIGHER EDUCATION LOAN AUTHORITY OF THE STATE OF MISSOURI a/k/a MISSOURI HIGHER EDUCATION LOAN AUTHORITY | |
| Defendant. | |

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ................................................................................ 3

II.    JURISDICTION AND VENUE ....................................................................... 6

III.    THE PARTIES.................................................................................................. 6

    A.    Missouri Higher Education Loan Authority (MOHELA) ...................... 6

    B.    Plaintiffs............................................................................................... 7

IV.    FACTUAL ALLEGATIONS .......................................................................... 8

    A.    Statutory Framework ............................................................................ 8

    B.    The Department of Education Contracts with Student Loan Servicers to Handle the Day-to-Day Administration of Federal Student Loans .................... 13

    C.    Background on MOHELA.................................................................... 14

    D.    The CARES Act Provides Student Loan Relief During the Pandemic .............. 23

    E.    The SAVE Plan.................................................................................... 24

    F.    MOHELA Is Repeatedly Warned of the Need to Adequately Prepare for the Post-Pandemic Return to Repayment ....................................... 27

    G.    MOHELA'S Gross Servicing Failures Compromise the Implementation of the SAVE Plan and Harm Borrowers ................................................. 35

    H.    MOHELA Fails to Implement the SAVE Plan in Compliance with the Department's Instructions and Applicable Law .................................... 36

    I.    The Department of Education Stops Assigning Federal Student Loan Accounts to MOHELA and Transfers Loans to Other Servicers ........................ 47

    J.    Multiple State Attorneys General Investigate MOHELA for Gross Servicing Failures ............................................................................... 48

V.    Plaintiff-specific allegations ......................................................................... 49

    A.    Jonathan Gibbs.................................................................................... 49

    B.    Susan Hart........................................................................................... 50

    C.    Jacob Lehman ..................................................................................... 52

    D.    Annette A. Robbins............................................................................. 54

    E.    Arthur Sprogis.................................................................................... 55

    F.    Pamela Yango ..................................................................................... 57

VI.    CLASS ACTION ALLEGATIONS .............................................................. 59

VII.    CLAIMS FOR RELIEF ................................................................................ 63

**TABLE OF CONTENTS**
**(continued)**

**Page**

FIRST CLAIM FOR RELIEF (Breach of Contract, on Behalf of Plaintiffs Gibbs, Lehman, Sprogis, and Yango and the SAVE Benefits Class)............ 63

SECOND CLAIM FOR RELIEF (Breach of Contract, on Behalf of Plaintiffs Hart, Lehman, and Robbins and the Application Processing Class) ............. 65

THIRD CLAIM FOR RELIEF (Breach of Contract, on Behalf of Plaintiffs Gibbs, Hart, Lehman, Robbins, Sprogis, and Yango and the Post-Stay Interest Class)................................................................................................. 67

FOURTH CLAIM FOR RELIEF (Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*, on Behalf of Plaintiff Hart and the Florida Application Processing Subclass).................. 70

FIFTH CLAIM FOR RELIEF (Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*, on Behalf of Plaintiff Hart and the Florida Post-Stay Interest Subclass).......................................... 71

SIXTH CLAIM FOR RELIEF (Violation of the New York General Business Law, N.Y. GBL § 349, on Behalf of Plaintiff Sprogis and the New York SAVE Benefits Subclass) ....................................................................... 72

SEVENTH CLAIM FOR RELIEF (Violation of the New York General Business Law, N.Y. GBL § 349, on Behalf of Plaintiff Sprogis and the New York Post-Stay Interest Subclass) ......................................................... 72

EIGHTH CLAIM FOR RELIEF (Violation of the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020, on Behalf of Plaintiff Lehman and the Washington SAVE Benefits Subclass) ............................... 73

NINTH CLAIM FOR RELIEF (Violation of the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020, on Behalf of Plaintiff Lehman and the Washington Application Processing Subclass).................. 74

TENTH CLAIM FOR RELIEF (Violation of the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020, on Behalf of Plaintiff Lehman and the Washington Post-Stay Interest Subclass)........................... 75

VIII.    PRAYER FOR RELIEF ........................................................................................ 76

IX.     JURY DEMAND ................................................................................................... 77

**EXHIBITS TO THE COMPLAINT**

EXHIBIT A:   Contract No. ED-FSA-11-D-0012 (Direct Loan Contract)

EXHIBIT B:   Contract No. 91003123D0004 (Unified Servicing and Data Solution Contract)

Plaintiffs Jonathan Gibbs, Susan Hart, Jacob Lehman, Annette A. Robbins, Arthur Sprogis, and Pamela Yango ("Plaintiffs"), individually and on behalf of classes of all other similarly situated persons, bring this action against Missouri Higher Education Loan Authority ("MOHELA" or "Defendant") for breaches of contract and violations of state consumer protection statutes, and in support thereof state:

## I.    <u>NATURE OF THE ACTION</u>

1.      Since 1993, the Federal Direct Loan Program has provided low-interest, government-backed loans to increase access to higher education in the United States. Such loans have become a critical lifeline for millions of students and their families, in Missouri and throughout all of the United States, as the cost of undergraduate and graduate education has skyrocketed. Today, the average student loan borrower carries a balance of more than $39,000. What was once a promising pathway to social and economic advancement has become, for many, a source of long-term financial hardship.

2.      To administer the federal student loans of nearly 42.5 million borrowers, the U.S. Department of Education (the "Department") contracts with and assigns third-party student loan servicers to perform services on its behalf, including billing, collections, repayment plan processing, and customer service functions. As the primary (and often only) point of contact for borrowers, these servicers perform the essential task of delivering federally mandated rights and benefits to borrowers, and their failures to do so can cause significant harm.

3.      During the pandemic, as other major servicers departed from the industry, MOHELA seized the opportunity to become one of the largest student loan servicers in the country, tripling its portfolio of federal student loans in just a few years. As of March 31, 2024, MOHELA serviced approximately $380.6 billion in federal student loans covering more than 8 million borrowers across the country. At the same time, MOHELA has struggled to keep up with

3

its rapid growth, leading to a series of operational failures that continue to negatively impact borrowers across the country. For example, in late 2023, the Department determined that MOHELA had incorrectly inflated the monthly bills for hundreds of thousands of borrowers by relying on outdated information and had separately failed to send timely billing statements to nearly 2.5 million borrowers. These operational failures resulted in the Department withholding payment of $7.2 million to MOHELA under its federal loan servicing contract, one of the most severe public rebukes of a student loan servicer in recent history.

4.      Earlier that same year, as the country recovered from a pandemic-fueled economic crisis, and in an effort to create a stronger safety net for federal student loan borrowers on income-based repayment plans, the Department of Education enacted regulations to transform the then-existing Revised Pay As You Earn ("REPAYE") plan into the newly branded Saving on a Valuable Education ("SAVE") plan. Among other things, the SAVE plan offered three primary improvements over the REPAYE plan: (i) an increase of the income exemption threshold, from 150% to 225% of the federal poverty guideline, which significantly reduced monthly payment amounts for low- and middle-income borrowers; (ii) the elimination of "negative amortization" by preventing unpaid interest from accruing, so long as the borrower makes their monthly payment; and (iii) the shortening of time before borrowers can have their remaining loan balances forgiven. With the expiration of certain pandemic-era relief, including a temporary pause on all student loan payments, borrowers across the country looked to the benefits provided under the SAVE plan and related federal regulations to reduce their financial burdens. Unfortunately for millions of borrowers whose loans are serviced by MOHELA, those benefits never came or were subject to lengthy and costly delays.

5.      With the implementation of the SAVE plan, MOHELA failed to comply with

federal requirements in three critical ways. *First*, starting on July 30, 2023, federal regulations required MOHELA to automatically transition borrowers on the REPAYE plan to the SAVE plan to receive two key SAVE plan benefits: the increase of the income exemption threshold and the nonaccrual of interest. MOHELA failed to timely do so for a substantial number of borrowers, leading to higher monthly payments and ballooning interest calculations. *Second*, guidance from the Department also required MOHELA to place loans in general forbearance, where interest would not accrue, if MOHELA could not process borrowers' applications to the SAVE plan within 60 days. For nearly a year, MOHELA routinely failed to meet the 60-day application processing requirement yet failed to place SAVE applicants' loans in the correct type of forbearance, leading to the improper accrual of additional interest and often higher monthly payments for those loans. *Third*, after the Eighth Circuit temporarily suspended implementation of the SAVE plan on July 18, 2024, until August 1, 2025 when interest accrual resumed, MOHELA failed to place borrowers' loans in administrative forbearance with a 0% interest rate, as was directed by the Department.[1]

6.      Together, these servicing failures and the subsequent mishandling of borrower accounts constitute breaches of MOHELA's contractual responsibilities under both its servicing contracts with the Department of Education and borrowers' individual contracts with the federal government. In failing to comply with federal laws, regulations, and guidance, MOHELA also violated state consumer protection laws. As a result, borrowers across the country have had to pay inaccurately inflated monthly payments and have been subject to the continued improper

---

[1] This litigation remains ongoing. On December 9, 2025, the Department of Education announced a proposed settlement agreement that, if approved by the court, would end the SAVE plan and move all SAVE borrowers into other repayment plans. *See, e.g.*, U.S. Dep't of Educ., *IDR Plan Court Actions: Impact on Borrowers*, https://studentaid.gov/announcements-events/idr-court-actions (last updated Dec. 22, 2025).

accrual of interest.

7.     The class members here are a broad coalition of student loan borrowers, from across the political spectrum, throughout the country, who have been harmed by MOHELA's failures.  Plaintiffs are student loan borrowers who, like other class members, were affected by MOHELA's failures. They now bring this action to enforce their rights and seek damages for the harms that have resulted from MOHELA's failures.

## II.    JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over all claims pleaded herein under 28 U.S.C. § 1332(d)(2) because it is a class action where the aggregate amount in controversy is in excess of $5,000,000, exclusive of interest and costs, at least one member of the proposed classes is a citizen of a state different from the Defendant MOHELA, the proposed classes each consist of more than 100 class members, and none of the enumerated exceptions apply to this action.

9.     This Court has personal jurisdiction over MOHELA because it is incorporated, has its principal place of business, has conducted business, and has committed acts and omissions complained of herein in Missouri.

10.     Venue is proper here because a substantial part of the events and omissions giving rise to these claims occurred in this District and because MOHELA has conducted, and continues to conduct, business in this District, where it has its principal place of business.

## III.    THE PARTIES

### A.    Missouri Higher Education Loan Authority (MOHELA)

11.     Defendant Missouri Higher Education Loan Authority ("MOHELA") is a Missouri public corporation with its headquarters in Chesterfield, St. Louis County, Missouri.

12.     MOHELA is one of the largest holders and servicers of student loans in the United States. As of June 30, 2024, MOHELA serviced approximately $328.9 billion in student

- 6 -

loan assets.[2] It employs a staff of more than 1,200 employees and 2,000 contractors.

**B.     Plaintiffs**

13.     Plaintiff Jonathan Gibbs ("Gibbs") is a resident of Lubbock, Texas. Gibbs took out federal student loans, which MOHELA began servicing in 2017. Gibbs transferred to the REPAYE plan in 2022 and should have been, but was not, automatically provided with the benefits of the SAVE plan after July 2023 as required.

14.     Plaintiff Susan Hart ("Hart") is a resident of Royal Palm Beach, Florida. Hart took out federal student loans, which MOHELA began servicing in 2020, and submitted an application to transfer those loans to the SAVE plan that was not processed within 60 days or placed into forbearance as required.

15.     Plaintiff Jacob Lehman ("Lehman") is a resident of Seattle, Washington. Lehman took out federal student loans, which MOHELA began servicing in 2020. Lehman initially selected the REPAYE plan to pay back his loans, and should have been, but was not, automatically provided with the benefits of the SAVE plan after July 2023 as required. Lehman also submitted an application to transfer his loans to the SAVE plan that was not processed within 60 days or placed into forbearance as required.

16.     Plaintiff Annette A. Robbins ("Robbins") is a resident of Danvers, Illinois. Robbins took out federal student loans, which MOHELA began servicing in 2024, and submitted an application to transfer those loans to the SAVE plan that was not processed within 60 days or placed into forbearance as required.

17.     Plaintiff Arthur Sprogis ("Sprogis") is a New York resident who resided in New

---

[2] MOHELA, *2024 Financial Statements and Schedule of Expenditures of Federal Awards*, *available at* https://www.mohela.com/DL/common/publicinfo/financialStatements.aspx.

York, New York during the Class Period, and is currently living abroad in Spain. Sprogis took out federal student loans, which MOHELA began servicing in 2022. Sprogis was enrolled in the REPAYE plan in 2019 and should have been, but was not, automatically provided with the benefits of the SAVE plan after July 2023 as required.

18.     Plaintiff Pamela Yango ("Yango") is a resident of San Anselmo, California. Yango took out federal student loans, which MOHELA began servicing in 2015. Yango was enrolled in the REPAYE plan in or around 2020 and should have been, but was not, automatically provided with the benefits of the SAVE plan after July 2023 as required.

## IV.     FACTUAL ALLEGATIONS

### A.     Statutory Framework

#### 1.     The Evolution of Student Loans Under the Higher Education Act

19.     Congress enacted the Higher Education Act, 20 U.S.C. 28, §§ 1001 *et seq*. (the "HEA") in 1965 to facilitate and increase access to postsecondary educational opportunities by providing financial assistance. *See* Pub. L. No. 89-329, 79 Stat. 1219 (1965) ("An Act to strengthen the educational resources of our college and universities and to provide financial assistance for students in postsecondary and higher education.") (cleaned up). This financial assistance takes the form of various grants and loans to students for the purpose of attending colleges and universities.

20.     To accomplish this objective, the HEA authorizes several different types of federal student loans, including loans issued by private lenders and guaranteed by the federal government.

21.     In 1993, Congress amended the HEA by establishing the William D. Ford Federal Direct Loan Program (the "Direct Loan Program"), through which the U.S. Department of Education (the "Department") originates and holds federal student loans. The Direct Loan

Program allows the Department to directly lend money to students, without using private lenders as intermediaries.

22. To manage the administration of these loans—including billing, collections, plan processing, and customer service—the Department contracts with third-party entities known as student loan servicers.

23. Student loan servicers, including MOHELA, do not own the loans they service under the Direct Loan Program. Rather, they perform services on behalf of the Department pursuant to servicing contracts. These servicers are responsible for ensuring the Department's loan programs are administered in compliance with federal statutes, regulations, and guidance, including those governing income-driven repayment ("IDR") plans such as the Saving on a Valuable Education (SAVE) plan. In IDR plans, student loan payments are calculated based on income, family size, and other factors reflecting the borrower's ability to pay. Depending on the plan, at the end of the repayment period, any remaining balance that has not been paid off may be forgiven.

24. Because borrowers interact directly with their assigned servicers, the performance of MOHELA and other servicers critically affects borrowers' access to rights and benefits conferred by federal law, including timely enrollment in repayment plans, accurate billing and interest calculation, and the proper application of qualifying payments toward loan forgiveness programs. Servicers are essential intermediaries between borrowers and the Department, and their failures can cause significant harm to borrowers while frustrating the purposes of the HEA and other pertinent statutes, regulations, and guidance.

25. Despite Congress's stated goals in enacting the HEA, the cost of higher education in the United States has risen dramatically, placing an increasing financial burden on students

and their families. What was once a pathway to upward mobility is now, for many, a source of long-term financial hardship.

26.     Accounting for inflation, the price of education has nearly tripled since 1980.[3] Between the 1999-2000 and 2019-2020 school years, tuition at the average 4-year institution increased by 136.5%.[4]

27.     These rising costs have consistently outpaced inflation, increasing 41.7% *faster than the rate of inflation* since 2000.[5] The astonishing escalation of these costs has outstripped wage growth and placed postsecondary education out of reach for many without taking on substantial debt.

28.     At the same time, the economic incentives to pursue higher education have become more pronounced. The unemployment rate for individuals who only have a high school diploma is approximately twice as high as that for college graduates. Further, the wage gap between college and high school graduates is higher than it has ever been in history, with college graduates earning approximately twice as much as high school graduates.

29.     As of 2025, as a result of these compounding pressures, approximately 42.5 million American student loan borrowers collectively owe about $1.7 trillion in federal student loan debt. The average borrower carries a balance of approximately $39,075.[6]

30.     Federal student loans have generally served as a more affordable option to finance

---

[3] Brianna McGurran, *College Tuition Inflation: Compare the Cost of College Over Time*, FORBES (May 9, 2023), https://www.forbes.com/advisor/student-loans/college-tuition-inflation/.

[4] Melanie Hanson, *Average Cost of College by Year*, EDUCATION DATA INITIATIVE (Sept. 23, 2023), https://educationdata.org/average-cost-of-college-by-year.

[5] *Id.*

[6] Melanie Hanson, *Student Loan Debt Statistics*, EDUCATION DATA INITIATIVE (Aug. 8, 2025), https://educationdata.org/student-loan-debt-statistics.

higher education, as opposed to private loans. They offer more flexible repayment options, including income-driven repayment plans and public service loan forgiveness, which are designed to reduce the risk of long-term financial distress and help borrowers manage their obligations in proportion to their income.

31.     However, the accessibility and functionality of these borrower protections depend almost entirely on the effective administration of loan programs by MOHELA and other student loan servicers. When servicers fail to accurately and promptly implement loan repayment options, borrowers are denied the very assistance that federal law guarantees them, frustrating the HEA's core statutory objectives and deepening the student debt crisis Congress sought to alleviate.

### 2.     Income-Driven Repayment (IDR) Plans

32.     IDR plans are a category of repayment options available to federal student loan borrowers. These plans are authorized under the HEA, as amended by the Direct Loan Program, 20 U.S.C. 28, § 1087e(d).

33.     IDR plans are designed to ensure that repayment obligations remain manageable relative to a borrower's income and family circumstances.

34.     Unlike standard repayment plans, which are based on the borrower's total loan balance amortized over a fixed term, IDR plans calculate monthly payments as a function of the borrower's income and family size. This structure is intended to protect low- and middle-income borrowers from unaffordable loan payments and reduce the risk of delinquency and default.

35.     Under an IDR plan, the amount of a borrower's monthly payments is calculated based on the borrower's annual income, rather than the borrower's total loan balance.

36.     As of September 2023, there were four IDR plans: (1) Saving on a Valuable Education (SAVE), formerly known as Revised Pay As You Earn (REPAYE); (2) Pay As You

Earn ("PAYE"); (3) Income-Based Repayment ("IBR"); and (4) Income-Contingent Repayment ("ICR").

37.    While each IDR plan has distinct eligibility criteria and repayment formulas, they all share a common underlying structure.

38.    First, payments are determined based on a borrower's "discretionary income," defined as income that exceeds a certain percentage of the federal poverty guideline, adjusted for family size and state of residence. For example, under the SAVE plan, discretionary income is defined as the difference between (a) the borrower's adjusted gross income and (b) 225% of the federal poverty guideline.

39.    Second, each IDR plan sets the borrower's monthly payment as a fixed percentage of their annual discretionary income (typically ranging from 10% to 20%), divided by twelve.

### 3.    Federally Held Student Loans Are Subject to a Standard Master Promissory Note

40.    In the context of the statutory and regulatory framework described above, every student loan originated and held pursuant to the federal Direct Loan Program is governed by a contract between the Department and the borrower, called a Master Promissory Note ("Master Promissory Note" or "MPN"). The standard Master Promissory Notes that govern the loans at issue here each contain substantially the same key provisions regarding the governing law, the parties' obligations, and the use of student loan servicers.

41.    Borrowers are presented with the terms of these Master Promissory Notes during the loan application process, and a borrower is required to consent to such terms as a condition of completing the application process.

42.    As set forth in their terms, the Master Promissory Notes require compliance with

all applicable federal laws and regulations, including the Higher Education Act (HEA), the Department's regulations, and any amendments thereto.

43.     The Master Promissory Notes also provide that loan servicers, like MOHELA, are used to handle billing and other communications related to each student loan. Similarly, the Master Promissory Notes also provide that while Direct Loans are originated by the federal government (namely, the Department of Education), the Department "contract[s] with servicers to process Direct Loan payments, deferment and forbearance requests, and other transactions, and to answer questions about Direct Loans."

44.     Further, the Master Promissory Notes provide that the interest terms for any loan originated thereunder are calculated in accordance with, and using a formulas specified by, federal laws.

**B.      The Department of Education Contracts with Student Loan Servicers to Handle the Day-to-Day Administration of Federal Student Loans**

45.     The Department is the legal holder of federal student loans made under the Direct Loan Program. However, the Department does not directly handle the daily administration of these loans and the servicing of borrowers' accounts. Instead, the Department contracts with student loan servicers to administer and handle most borrower-facing and operational aspects of the Direct Loan Program.

46.     Among other things, student loan servicers send monthly billing statements to borrowers, calculate monthly principal and interest payment amounts, collect and process monthly payments, apply these payments to principal and interest balances, maintain loan records, and provide customer service.

47.     Student loan servicers also play a central role in implementing statutory and regulatory requirements and borrower protections regarding the Direct Loan Program. Among

other things, student loan servicers receive, review, and process borrower applications for repayment options such as IDR plans.

48.    In administering IDR plans, student loan servicers are required to apply governing statutory provisions and to follow the Department's detailed guidance, including instructions for calculating monthly principal and interest payments and determining eligibility to participate in the plan.

49.    Servicers are required to implement the Department's policies accurately, uniformly, and in accordance with their contractual obligations to the Department. They are prohibited from arbitrarily denying access to benefits available under the HEA, such as IDR enrollment, payment adjustments, or progression toward loan forgiveness.

50.    For most borrowers, student loan servicers are the primary—and effectively the only—point of contact for all aspects of their federal student loan obligations. Borrowers rely on servicers to provide timely, accurate, and complete information about repayment options, balances, due dates, and the steps needed to qualify for borrower protections.

51.    Because borrowers interact directly with the servicer and not with the Department, the servicer's conduct has an outsized impact on a borrower's ability to access and exercise rights conferred by federal law. A servicer's errors, delays, or misconduct can harm borrowers, including but not limited to missed opportunities for reduced payments, improper accrual of interest, unwarranted delinquency or default, and the loss of qualifying time toward forgiveness.

**C.    Background on MOHELA**

52.    MOHELA was established in 1981 pursuant to the Missouri Higher Education Loan Authority Act, Title XI, Chapter 173, Sections 173.350 to 173.445 of the Missouri Revised Statutes (the "Enabling Act"). In creating MOHELA, the Missouri legislature intended to "assure

that all eligible postsecondary education students have access to student loans that are guaranteed or insured." Mo. Rev. Stat. § 173.360 (1981).

53.     MOHELA alternatively describes itself as a non-profit organization or a quasi-governmental entity.[7] Though its structure is governed by statute, *see* Mo. Rev. Stat. § 173.360, it is empowered to act independently from the state of Missouri[8] and to acquire, hold, and dispose of personal property, *see* Mo. Rev. Stat. § 173.385.1(14).

54.     MOHELA can sue and be sued in its own name. Mo. Rev. Stat. § 173.385.1(3) (defining MOHELA's powers to include the power to "sue and be sued and to prosecute and defend, at law or in equity, in any court having jurisdiction of the subject matter and of the parties."). It is also statutorily barred from transferring or depositing any assets to the state of Missouri. *See* Mo. Rev. Stat. § 173.425.

55.     Over the first 30 years of its existence, the Enabling Act was amended to provide MOHELA with expanded powers to finance, originate, acquire, and service student loans, including those guaranteed or insured pursuant to the Higher Education Act.[9]  By 2006, MOHELA serviced loans with more than $5 billion in assets.[10]

---

[7] *Compare MOHELA, Missouri Contributions*, https://www.mohela.com/DL/resourceCenter/MissouriContributions.aspx (last visited Nov. 18, 2025) (describing MOHELA as a "quasi-governmental entity") *with* MOHELA*, Get to Know MOHELA*, https://servicing.mohela.com/Content/pages/Common/About.aspx (last visited Nov. 18, 2025) (describing MOHELA as a "non-profit organization").

[8] *MOHELA Was Caught Lying to Student Loan Borrowers, and Now it Is Quietly Forcing Them to Waive Their Rights*, STUDENT BORROWER PROT. CTR. (Oct. 10, 2024), https://protectborrowers.org/mohela-was-caught-lying-to-student-loan-borrowers-and-now-it-is-quietly-forcing-them-to-waive-their-rights/.

[9] MOHELA, *Financial Statements as of and for the Years Ended June 30, 2006 and 2005, Supplemental Schedule as of June 30, 2006, and Independent Auditors' Reports*, https://www.mohela.com/dl/common/publicinfo/financialStatements.aspx?idx=2006 (hereinafter "MOHELA 2006 Report").

[10] *Id.*

56. As described below, MOHELA shifted gears in 2011 to focus on national federal student loan servicing. MOHELA's loan portfolio grew steadily through the 2010s. In 2020, the global pandemic caused upheaval in the student loan industry, and MOHELA took the opportunity to fill a vacuum, tripling its portfolio of federal student loans between 2021 and 2024.

57. Despite its rapid expansion and high number of borrower-reported problems, MOHELA continues to present itself as a pinnacle of customer service and support. According to the company: "MOHELA is committed to giving our customers a first-rate experience. To aid in repaying your student loans, we promise to listen, offer customized solutions to meet your specific needs and provide superior guidance as your dedicated resource expert."[11] MOHELA emphasizes its "40 years in the student loan servicing industry."[12]

### 1. MOHELA's Expansion into the Federal Student Loan Industry Gained Enormous Speed During the Global Pandemic

58. At the time MOHELA was created, the Missouri legislature intended to create an entity that would support Missouri-based schools and businesses. MOHELA was established "in order to support the efforts of public colleges and universities to create and fund capital projects, and in order to support the Missouri technology corporation's ability to work with colleges and universities in identifying opportunities for commercializing technologies . . . ."  Mo. Rev. Stat. § 173.360. The statute defined "[p]ublic colleges and universities" as "any public community college, public college, or public university located in the state of Missouri."  Mo. Rev. Stat. § 173.355(7).

---

[11] MOHELA, *New to MOHELA!*, https://servicing.mohela.com/Content/pages/Common/Welcome.aspx (last visited Nov. 18, 2025).

[12] *Id.*

59.     MOHELA's focus shifted in 2011, when it entered into its first contract with the Department of Education and began to focus on nationwide loan servicing. Under that contract, MOHELA would service about 100,000 federal loans.[13]

60.     At the same time, MOHELA began increasing its Washington, D.C. operations. MOHELA established a Washington, D.C. office in the same building complex that housed the Department of Education's Office of Federal Student Aid ("FSA"). And MOHELA hired an outside firm to lobby Congress and the Department.[14]

61.     MOHELA's lobbying efforts paid off, and MOHELA continued to expand its federal loan servicing business throughout the 2010s. Nevertheless, MOHELA remained a relatively small player in the Department's overall loan portfolio during that time period. Until the global pandemic, the vast majority of federal student loans were serviced by four main servicers: Sallie Mae (later called Navient), Nelnet, Great Lakes, and the Pennsylvania Higher Education Assistance Agency (PHEAA, operating under the name FedLoan Servicing).[15]

62.     The global pandemic shook up the federal student loan industry. At the end of 2021, two of the four major loan servicers—Navient and PHEAA—exited the industry, as did several smaller servicers.[16]

63.     MOHELA took this opportunity to fill the vacuum left by these departures.

---

[13] Michael Stratford, *The Student Loan Company Being Used to Attack Biden's Debt Relief Plan*, POLITICO (Dec. 17, 2022), https://www.politico.com/news/2022/12/17/student-loan-bidens-debt-relief-plan-00074197.

[14] *Id.*

[15] *The MOHELA Papers: The Rise of a Student Loan Servicing Giant and the Fall of the Student Loan System,* STUDENT BORROWER PROT. CTR. & AM. FED. OF TEACHERS, (Feb. 2024), downloadable at https://protectborrowers.org/resource/the-mohela-papers-report/.

[16] AJ Dellinger, *What You Need to Know About the Companies No Longer Doing Federal Student Loan Servicing*, BANKRATE (Oct. 3, 2025), https://www.bankrate.com/loans/student-loans/servicers-no-longer-working-with-education-department/.

MOHELA took over most of PHEAA's 8.5 million federal student loan accounts.[17]  This takeover included all accounts for which borrowers sought relief under the Public Service Loan Forgiveness program, which cancels the debt of government and nonprofit workers after making ten years of qualifying payments.[18]  MOHELA also took on Navient's portfolio of private student loans.[19]

64.     From 2021 to 2024, MOHELA tripled its portfolio of Department-held federal loans. It also continues to expand its portfolio of private student loans. MOHELA is now one of the largest student loan servicers in the country.[20]

65.     MOHELA has profited, and continues to profit, massively from its ever-expanding loan portfolio. In 2021 alone—just after MOHELA took on the first of its additional federal loan accounts—it brought in $130 million in revenue.[21] The bulk of this revenue came from MOHELA's federal student loan servicing contracts. By 2023, MOHELA brought in $358.6 million in revenue. Of that, $295 million was derived from servicing fees for federal student loans.[22]

---

[17] *Id.*

[18] Katie Lobosco, *About 2 Million People Are About to Get a New Student Loan Servicer. Here's What You Need to Know*, CNN (June 27, 2022), https://www.cnn.com/2022/06/27/politics/fedloan-mohela-new-student-loan-servicer.

[19] Press Release, Navient, Navient Finalizes Student Loan Servicing Agreement (May 13, 2024), https://news.navient.com/news-releases/news-release-details/navient-finalizes-student-loan-servicing-agreement.

[20] *The MOHELA Papers*, *supra* n.14; Press Release, Senator Elizabeth Warren, Warren Invites MOHELA CEO to Testify Before Congress About Student Loan Servicing (Mar. 18, 2024), https://www.warren.senate.gov/newsroom/press-releases/warren-invites-mohela-ceo-to-testify-before-congress-about-student-loan-servicing.

[21] Stratford, *supra*, n.12.

[22] MOHELA, *Financial Statements and Schedule of Expenditures of Federal Awards* (FY 2023) at 11, 14, accessible at https://www.mohela.com/DL/common/publicinfo/financialStatements.aspx.

66.    Between June 30, 2022 and June 30, 2023 alone, the total number of loan accounts serviced by MOHELA increased by 2.6 million. The servicing fees pocketed by MOHELA during this time period increased by 160%.[23]

67.    As of March 31, 2024, MOHELA serviced approximately $380.6 billion in Department-backed student loans (covering more than 8 million borrowers across the country).[24]

### 2.    MOHELA's Servicing Contracts with the Department of Education

68.    During the period relevant to this action, the Department's Office of Federal Student Aid (FSA) awarded two principal contracts to MOHELA: (1) Contract No. ED-FSA-11-D-0012 (the "Direct Loan Contract" or the "DL Contract"), and (2) Contract No. 91003123D0004 (the "Unified Servicing and Data Solution Contract" or the "USDS Contract"). The DL Contract and the USDS Contract, together, are referred to herein as the "Servicing Contracts."

69.    Both the DL Contract and the USDS Contract are Indefinite Delivery, Indefinite Quantity (IDIQ) contracts, which establish a framework for the provision of products and permit the government to subsequently authorize specific work through the issuance of task orders.

70.    The DL Contract was awarded to MOHELA on September 27, 2011. The DL Contract governed MOHELA's administration and servicing of Direct Loans and, pursuant to a modification to the contract, also governed MOHELA's administration and servicing of the Public Service Loan Forgiveness Program. MOHELA serviced student loans under the DL Contract until December 31, 2024. More than $1 billion has been paid to MOHELA under the

---

[23] *Id.* at 4.

[24] MOHELA, Frank Reyes, Chief Financial Officer, FFELP Portfolio and USDS Contract (Oct. 30, 2024), at 5, *available at* https://www.mohela.com/dl/common/publicInfo/investorInformation.aspx.

DL Contract.[25]

71.     Under the DL Contract, MOHELA was "responsible for maintaining a full understanding of all federal and state laws and regulations and FSA requirements and ensuring that all aspects of the service continue to remain in compliance as changes occur." Ex. A, § C.1.4.3. MOHELA was also required under the DL Contract to "provide a service flexible enough to handle new requirements generated by Congress and respond to legislative mandates and policy changes." *Id.*, § C.1.4.4.

72.     The DL Contract contemplates liability by MOHELA to borrowers as third-party beneficiaries, for breaches of MOHELA's duties under the DL Contract. For example, the DL Contract states the FSA's "core mission is to ensure that all eligible individuals benefit from federal financial assistance – grants, loans and work-study programs – for education beyond high school." Ex. A, § C.1.1. The DL Contract further describes its own purpose as "contract[ing] with 'eligible' and 'qualified' entities to service Title IV student financial aid, in accordance with Section 2212 of the Health Care and Education Reconciliation Act of 2010 (Pub.L. 111-152, 124 Stat. 1029) . . . ." *Id.*, § C.1.2. The DL Contract also states: "Borrowers whose loans are not being serviced in compliance with the Requirements, Policy and Procedures for servicing federally held debt due to the fault of the servicer (e.g. correct interest calculations, correct balances, interest determination and calculations, notices sent properly, proper due diligence, etc.), will not be billable to the Government from the initial point of non-compliance." *Id.*, § B.12.L.

---

[25] USAspending.gov, *Award Profile, Department of Education contract with the Missouri Higher Education Loan Authority, PIID EDFSA11D0012*, https://www.usaspending.gov/award/CONT_IDV_EDFSA11D0012_9100 (last visited Nov. 18. 2025).

73.     In addition, the DL Contract incorporates terms and conditions applicable to all Title VI Additional Servicers ("TIVAS"). These TIVAS Terms and Conditions provide, among other things, an ongoing allocation methodology for determining the allocation or assignment of federally held student loans across multiple servicers, including MOHELA. Section B of the TIVAS Terms and Conditions explains: "Each servicer will be assigned an allocation of new volume by dividing that servicer's total score by the combined total scores of all servicers. The resulting percentage will determine each servicer's percentage of new volume of Federally Held Debt." Ex. A, Attach. A-8 at B.

74.     The USDS Contract was awarded to MOHELA on April 24, 2023. Like the DL Contract, the USDS Contract similarly governs MOHELA's administration and servicing of Direct Loans. The USDS Contract was intended to replace existing contracts with student loan servicers, including the DL Contract. MOHELA began servicing student loans pursuant to the USDS contract on April 1, 2024. To date, over $280 million has been paid to MOHELA under the USDS Contract.[26]

75.     As described therein, the USDS Contract is intended to provide the following:

- Complete Student Loan Servicing;
- Student Loan Consolidation Origination and Disbursement;
- Financial Reporting;
- Processing of Specialty Claims (discharge, forgiveness, and cancellation);
- Complete Fulfillment;
- Operational Reporting;
- Compliance Monitoring; and
- Data Integrations with other FSA Systems.

---

[26] USAspending.gov, *Award Profile, Department of Education contract with the Missouri Higher Education Loan Authority, 91003123D0004*, https://www.usaspending.gov/award/CONT_IDV_91003123D0004_9100 (last visited Nov. 18. 2025).

76.     Under the USDS Contract, MOHELA is required to "comply with all applicable Federal and State rules, laws, regulations, and Department guidelines applicable to the USDS Program (including all accessibility elements such as 504/508 compliance)." Ex. B, § I.C.3.1.d. Further, the USDS Contract provides that MOHELA "shall establish a process to monitor changes to applicable laws and regulations to ensure compliance. If [MOHELA] identifies a change in applicable law, [MOHELA] must notify FSA by email to the Contracting Officer (CO) to determine the implications of such change to the Contract, the technical design, and/or operational procedures. This includes any scope changes to the Contract to ensure compliance with applicable Federal and State laws and regulations." *Id.*

77.     The USDS Contract also provides for a "Phase-In-Period" during which MOHELA was required to "prepare to assume full responsibility for all areas of operation in accordance with the terms and conditions of the Contract." Ex. B, § I.C.3.4.c.iii.1. Before servicing student loans on a "Go-Live" date, MOHELA was required to, among other things, (a) recruit, hire, and train necessary personnel; and (b) establish a loan servicing system for the management of borrower accounts. Ex. B, § C.3.4.c.iii.3.

78.     The USDS Contract contemplates liability by MOHELA to borrowers as third-party beneficiaries, for breaches of MOHELA's duties under the USDS Contract. For example, the USDS Contract explains that the contract "supports the following FSA goals: Provide all federally managed borrowers with complete account management capabilities on StudentAid.gov; Reduce the disruption of account transfers; and Increase accountability for servicers via clear, measurable service-level agreements." Ex. B, § C.2. The USDS Contract also states: "For any borrower accounts that the USDS Servicer caused or substantially contributed to non-compliant servicing of such borrower accounts, the servicing of such shall not be billable to

FSA from the initial point of occurrence. Such non-compliant servicing includes borrower accounts not being serviced in compliance with any applicable statutory requirements, regulatory requirements, the terms and conditions of the Contract, or FSA guidance." Ex. B, § I.C.3.1.o.

79.     Under the USDS Contract, "[MOHELA] acknowledges that it is not the U.S. Department of Education, and is not acting as the U.S. Government under this Contract. As such, [MOHELA] acknowledges that any claim or defense of Sovereign Immunity or Qualified Immunity is not applicable to work performed under the Contract and any Task Order issued under the Contract." Ex. B, § I.C.3.1.q.

80.     Between April 1, 2024 and October 2024, MOHELA serviced student loans under both the DL Contract and the USDS Contract. During that time, MOHELA gradually transferred loan accounts serviced under the DL Contract (managed through an older servicing platform) to the framework of the USDS Contract (managed through a newer servicing platform provided by Fiserv Solutions, LLC). Thus, the servicing of student loan accounts under the DL Contract was gradually phased out by the end of 2024.

81.     While student loan accounts were transitioned to the new servicing platform, MOHELA blocked borrowers' access to all records via its website for approximately two weeks. After access was restored on the new Fiserv platform, MOHELA blocked borrowers' access to historical documents, and borrowers were only able to access documents from the date of the platform transfer going forward. To this day, many borrowers are unable to access and retrieve their historical account statements and other important loan documents from MOHELA's platform.

**D.      The CARES Act Provides Student Loan Relief During the Pandemic**

82.     On March 25, 2020, in response to the economic crisis caused by the COVID-19 pandemic, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES

Act").

83.     Section 3513 of the CARES Act provided temporary but comprehensive relief to federal student loan borrowers by suspending all payments on federally held student loans, halting collection efforts on defaulted loans, and setting the interest rate on eligible loans to 0%, initially for the period March 13, 2020 through September 30, 2020.

84.     The payment pause applied to all loans owned by the Department of Education.

85.     The relief provided by the CARES Act was extended multiple times through federal administrative action. Although the statute originally authorized relief only through September 2020, the Department extended the payment pause on eight occasions—ultimately through August 2023—to provide continued relief during the evolving pandemic.

86.     The payment pause ended on or around September 1, 2023, pursuant to the Fiscal Responsibility Act of 2023, which included provisions setting the end date for the student loan payment pause.

87.     Payments resumed in October 2023, marking the end of the three-year administrative forbearance period that had shielded more than 40 million borrowers from monthly obligations and interest accrual. During this transitional period, the Department and its servicers, including MOHELA, were expected to assist borrowers in reentering repayment and in enrolling or reenrolling in affordable repayment options, including the newly introduced SAVE plan.

**E.     The SAVE Plan**

88.     In 2023, the Department of Education introduced the Saving on a Valuable Education (SAVE) plan, which it described and advertised as the most affordable federal student loan repayment option in U.S. history. The Department did not introduce an entirely new plan. Instead, the then-existing Revised Pay As You Earn (REPAYE) plan essentially became the

SAVE plan, which was implemented as part of a broader regulatory overhaul by the Department of income-driven repayment (IDR) plans, pursuant to its authority under the Higher Education Act.

89.     The SAVE plan introduced several borrower-protective reforms aimed at reducing monthly payments, limiting interest accrual, and accelerating loan forgiveness. These features were designed to make student loan repayment more affordable and manageable, particularly for low- and middle-income borrowers.

90.     First, the SAVE plan expanded the definition of "discretionary income" by raising the income exemption threshold from 150% to 225% of the federal poverty guideline, adjusted for family size and location. This change significantly reduced monthly payment amounts for many borrowers, especially those with lower incomes.

91.     Second, the SAVE plan eliminated "negative amortization" by preventing any unpaid monthly interest from being added to a borrower's loan balance, so long as the borrower makes their required monthly payment—even if that payment is $0.

92.     Third, the SAVE plan shortened the time to forgiveness by implementing a sliding-scale forgiveness timeline. Borrowers with original principal balances of $12,000 or less can qualify for loan forgiveness after as few as 10 years of qualifying payments, with the forgiveness timeline increasing by one year for each additional $1,000 borrowed. After 20 years (for borrowers with only undergraduate loans) or 25 years (for those with graduate loans), any remaining balance is forgiven, regardless of the amount initially borrowed.

93.     On July 10, 2023, the Department published a Final Rule, modifying the existing REPAYE plan and renaming it the SAVE plan. The Department specified in its Final Rule that borrowers on REPAYE would automatically receive the benefits associated with the SAVE plan,

without having to submit any application or documentation:

> The Department initially contemplated creating another repayment plan. After considering concerns about the complexity of the student loan repayment system and the challenges of navigating multiple IDR plans, we instead decided to reform the current REPAYE plan to provide greater benefits to borrowers. However, given the extensive improvements being made to REPAYE, we have decided to rename REPAYE as the Saving on a Valuable Education (SAVE) plan. This new name will reduce confusion for borrowers as we transition from the existing terms of the REPAYE plan. Borrowers currently enrolled on the REPAYE plan will not have to do anything to receive the benefits of the SAVE plan, and the new name will be reflected on written and electronic forms and records over time.[27]

94. The effective date of the regulations implementing the SAVE plan was July 1, 2024.

95. However, the Secretary of Education exercised his authority under Section 482(c) of the HEA to designate certain of the regulatory changes for implementation beginning on July 30, 2023.[28] Specifically, the Secretary designated the following provisions for implementation beginning on July 30, 2023: "[i]ncreasing the income exemption to 225 percent of the applicable poverty guideline in the REPAYE plan as described in § 685.209(f)" and "[n]ot charging accrued interest to the borrower after the borrower's payment on REPAYE is applied as described in § 685.209(h)".

---

[27] Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 Fed. Reg. 43820, 43822 (July 10, 2023); *see also* William D. Ford Federal Direct Loan Program, 34 C.F.R. § 685.209(a) (listing the four IDR plans, including "[t]he Revised Pay As You Earn (REPAYE) Plan, which may also be referred to as the Saving on a Valuable Education (SAVE) plan").

[28] Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 Fed. Reg. 43820, 43820-21 (July 10, 2023); *see also* William D. Ford Federal Direct Loan Program, 34 C.F.R. § 685.209(f) (payment-threshold benefit), § 685.209(h) (nonaccrual of interest benefit).

**F.**      **MOHELA Is Repeatedly Warned of the Need to Adequately Prepare for the Post-Pandemic Return to Repayment**

96.      In the years leading up to the return to repayment, MOHELA was repeatedly warned that it needed to take all measures necessary to ensure that borrowers would be subject to the terms of the appropriate repayment plan once their loans transitioned back to repayment status. MOHELA was also constantly reminded of its obligation to comply with Department of Education regulations and instructions in servicing federal student loans, and to communicate transparently with borrowers regarding the status of their loans. Despite the repeated warnings, MOHELA grossly failed at each of these obligations.

**1.      The June 2021 Letter to MOHELA**

97.      On June 21, 2021, three U.S. Senators sent a letter (the "June 2021 Letter") to Raymond H. Bayer, Jr., MOHELA's then-Chief Executive Officer ("CEO Bayer").[29] The purpose of the letter was to request information regarding MOHELA's "plans to support the millions of federal student loan borrowers who are scheduled to transition into repayment once the pause on their loan payments and interest ends in September."

98.      The letter notes that the "student loan payment and interest pause presents MOHELA and other servicers with an opportunity to enroll borrowers in an appropriate repayment plan and to avoid dropping them into an untenable situation when their payments resume, but this will require a coordinated and proactive approach that goes beyond blanket emails and form letters."

99.      The letter concluded by asking for information about the number of borrowers

---

[29] Letter from Senators Warren, Markey and Smith to Raymond Bayer, CEO, MOHELA (June 21, 2021), https://www.warren.senate.gov/imo/media/doc/2021.06.21%20Letter%20to%20MOHELA%20re%20Restarting%20Student%20Loan%20Repayments.pdf.

that will transition back into repayment, what proactive approaches were taken to ensure borrowers are on the right repayment plan, and information on the breakdown of federal direct loans, among other information.

100.    On July 6, 2021, MOHELA responded to the June 2021 Letter. MOHELA represented that it was "making outbound calls to 'check in' with borrowers which includes repayment plan information," that it was "[a]ctively recruiting, hiring, and training Customer Service Representatives," conducting "[r]efresher training," and "on schedule" to hire and train 74 staff members, after laying off a total of 63 "early in the pandemic."[30]

### 2.    The December 2021 Letter to MOHELA

101.    On December 2, 2021, four U.S. Senators sent another letter (the "December 2021 Letter") to MOHELA CEO Bayer.[31]

102.    The December 2021 Letter warned that repayment would resume on student loan borrowers' federal loans in 60 days, and that the "simultaneous restart of 32 million borrowers' loans, half of whom will also be transferring to a new loan servicer, marks an unprecedented event with a heightened risk of borrower harm."

103.    The December 2021 Letter noted that servicers had reported that they needed "more time to ensure that staffing was adequate to support borrowers, estimating that they would need from 57 to as many as 900 hires" and that the "process of recruiting, hiring, training, and supervising additional staff was expected to take three to four months.

---

[30] Letter from MOHELA to Senators Warren, Mackey, and Smith (July 6, 2021), https://www.warren.senate.gov/imo/media/doc/Student%20Loan%20Servicer%20Responses.pdf

[31] Letter from Senators Warren, Van Hollen, Blumenthal, and Smith to Loan Servicer CEOS (Dec. 2, 2021), https://www.warren.senate.gov/imo/media/doc/2021.12.2%20Letter%20to%20continuing%20federal%20student%20loan%20servicers.pdf.

104.    On June 23, 2021, the Senators asked that the Department delay the repayment restart date based on their findings.

105.    In August 2021, the Department of Education announced it was pushing back the payment restart date to January 31, 2022.

106.    The December 2021 Letter also emphasized that FSA had announced new servicer contract extensions "with new and higher standards for the level of service student borrowers will receive," including performance metrics for customer service representatives' ability to answer borrower questions and help with navigating repayment options, along with expanded call center hours. The letter specifically warned MOHELA that "servicers will need to work urgently to hire and train staff to meet these higher thresholds in time for the payment restart."

107.    The December 2021 Letter concluded with requests for information on MOHELA's "readiness for the restart of payments and to meet FSA's stronger standards for protecting borrowers," including what proactive steps MOHELA had taken to ensure borrowers would successfully transition back to repayments and to ensure borrowers were placed on the right payment plan, details on outreach to borrowers, overviews on the increase in hiring and on training new staff, and whether FSA's new expectations would be met.

### 3.    The July 2023 Letter to MOHELA

108.    On July 18, 2023, six U.S. Senators sent a letter (the "July 2023 Letter") to Scott Giles, MOHELA's Chief Executive Officer ("Mr. Giles").[32]

---

[32] Letter from Senators Warren, Blumenthal, Van Hollen, Markey, Brown and Mendez to Anthony Hollin, CEO of EdFinancial, Bruce Caswell, CEO of Maximus Federal Services, Inc., Scott Giles, CEO of MOHELA, and Jeffery Noordhoek, CEO of Nelnet (July 18, 2023), https://www.warren.senate.gov/imo/media/doc/Letter%20to%20Servicers.pdf.

109.     The July 2023 Letter inquired regarding MOHELA's "plans to support the more than 40 million federal student loan borrowers who will resume payments on their student loans for the first time in more than three and a half years following the enactment of the *Fiscal Responsibility Act*, which codifies the termination of the suspension on loan payments, interest, and collections related to the COVID-19 pandemic on August 30, 2023."

110.     The July 2023 Letter stated that "it is critical that servicers dedicate sufficient staff to respond to borrowers seeking information about the return to repayment, provide accurate information to borrowers about their payment obligations and options to manage their loan, ensure borrowers are assigned to the appropriate payment plan, and notify borrowers about any changes on a timely basis."

111.     On August 8, 2023, MOHELA responded to the July 2023 Letter and provided the following information:[33]

- As of February 1, 2020, MOHELA serviced 2,464,028 student borrowers;

- As of August 3, 2023, MOHELA serviced 7,773,939 student borrowers;

- From June 1, 2023 until July 26, 2023, 362,441 borrowers contacted MOHELA via the internet or by phone;

- As of February 1, 2023, MOHELA had 483 staff;

- As of August 8, 2023, MOHELA claimed to have "474 released customer service representatives" and another "606 in various stages of training;" and

- MOHELA projected a total need of 1,177 customer service agents, which it claimed to be "97 away" from having.

---

[33] Letter from MOHELA to Senators Warren, Blumenthal, Van Hollen, Markey, Brown, and Menendez (Aug. 8, 2023), https://www.warren.senate.gov/imo/media/doc/Servicers%20Responses.pdf.

112.     In addition, in its response, MOHELA claimed it could not afford to add sufficient staff.

### 4.     The September 2023 Letter to Secretary Cardona

113.     On September 21, 2023, six U.S. Senators sent a letter (the "September 2023 Letter") to then-Secretary of Education Miguel Cardona.[34]

114.     The September 2023 Letter addressed the consequences of the processing issues and long wait times, stating that "MOHELA services more than 8 million borrowers, many of whom have suffered negative economic and mental health consequences as a result of these longstanding servicing issues."

### 5.     The October 2023 Decision Memorandum

115.     On October 29, 2023, the Department published an internal memorandum titled "Request Approval: Use of Secretary's Compromise Authority for Remediating Potential Harm to Borrowers Caused by Return to Repayment Servicing Errors" (the "October 29 Memo").[35]

116.     The October 29 Memo "identified several cohorts of borrowers returning to repayment who may have been harmed by servicing errors."

117.     The October 29 Memo notes that "FSA and servicer call centers have struggled to handle the volume of borrowers seeking information and making repayment arrangements." It also states that "only half of borrowers trying to call their servicer this week actually got through

---

[34] Letter from Senators Warren, King, Padilla, Menendez, Markey and Booker to Secretary of Education Miguel Cardona (Sept. 21, 2023), https://www.king.senate.gov/imo/media/doc/letter_to_secretary_cardona.pdf.

[35] Decision Memorandum from the Executive Director, Vendor Oversight & Program Accountability to James Kvaal, Undersecretary, Department of Education on Request Approval: Use of Secretary's Compromise Authority for Remediating Potential Harm to Borrowers Caused by Return to Repayment Servicing Errors (Oct. 29, 2023), https://www.ed.gov/sites/ed/files/policy/gen/leg/foia/decision-memorandum-return-to-repayment-servicing-errors-10-29-23-signed-redacted.pdf.

(approximately 52 percent abandonment rate)." Moreover, according to the October 29 Memo, FSA's call monitoring team listened into calls between borrowers and servicers where customer service representatives simply advised customers to submit new applications online.

118.    The October 29 Memo confirms that the "issues contributing to these servicing errors were largely out of the borrower's control."

119.    The October 29 Memo assesses the potential for litigation "against the Department or one of FSA's vendors (e.g., a class action lawsuit)" and observes that "[i]f FSA does not fully remediate the harm experienced by borrowers due to servicing errors, there is a significant litigation risk against the Department and/or our vendors."

120.    The October 29 Memo acknowledges some of the serious legal consequences of servicer failings:

> It is likely that, if FSA fails to fully remediate these borrowers as promised, borrowers who were financially harmed due to servicing errors would seek a legal remedy against their servicers and/or the Department. Although the Department is immune from certain types of borrower claims related to servicing and oversight of servicers, liability for the servicers themselves could also limit the Department's ability to enforce these loans in full in the future.
>
> Additionally, these servicing errors potentially violate several federal and state consumer protection laws. Federal and state regulators who are currently conducting supervisory examinations of FSA's loan servicers to monitor return to repayment have already indicated that if FSA does not fully remediate these borrowers, they will likely find violations of their consumer protection laws and require servicers to remediate the problems experienced by borrowers themselves and impose monetary fines against the servicers, while not fully fixing the problems caused for borrowers. Servicers facing these penalties may file "Requests for Equitable Adjustments" (REAs) demanding that FSA reimburse them for the additional costs beyond those clearly attributable to their own errors, such as receiving conflicting information from prior servicers and unclear or erroneous information from FSA.

**6.     The November 2023 Letter to MOHELA**

121.     On November 7, 2023, four U.S. Senators sent a letter (the "November 2023 Letter") to MOHELA.[36]

122.     The November 2023 Letter described the Department of Education's decision to withhold a $7.2 million payment to MOHELA because it "failed to meet its basic obligation by failing to send billing statements on time to 2.5 million borrowers," leaving more than 830,000 borrowers delinquent on their loans.

123.     The November 2023 Letter then recounted that the Department subsequently required MOHELA to place all affected borrowers in administrative forbearance while "MOHELA cleans up its mess." It called out MOHELA for misinforming borrowers that "[d]aily interest continues to accrue on [their] loans" during the administrative forbearance, despite the Department's explicit announcement that it would "adjust to zero any interest that accrues" during the forbearance.

124.     The November 2023 Letter concluded: "Your failure to meet this fundamental loan-servicing responsibility places hundreds of thousands of borrowers at risk of financial anxiety and insecurity. MOHELA must get its house in order immediately."

**7.     The May 2024 Letter to Secretary Cardona**

125.     On May 8, 2024, ten U.S. Senators sent a letter (the "May 2024 Letter") to then-Secretary of Education Miguel Cardona.[37]

---

[36] Letter from Senators Markey, Warren, Van Hollen, and Blumenthal to Scott Giles, CEO, MOHELA (Nov. 7, 2023), https://www.markey.senate.gov/imo/media/doc/letter_to_mohela_on_borrowers_-_110723pdf.pdf.

[37] Letter from Senators Warren, Blumenthal, Wyden, Merkley, Warnock, Butler, Sanders, Van Hollen, Markey and Welch to Secretary of Education Miguel Cardona (May 8, 2024), https://www.insidehighered.com/sites/default/files/2024-

126.    The May 2024 Letter described FSA's decision to begin transferring a portion of MOHELA's borrower accounts to other federal student loan servicers starting in April 2024. FSA's announcement at the time specified that these transfers were requested by MOHELA.

127.    The May 2024 Letter also noted "a host of failures by MOHELA during the return to repayment after the COVID-19 pause on student loan payments, interest, and collections ended" and observed that "[w]hile every servicer failed to adequately prepare for the return to repayment, MOHELA made over **1.5 million more billing-related errors than all other servicers combined**." (emphasis added.)

128.    Finally, the May 2024 Letter recounted that on April 10, 2024, the Senate Banking, Housing, and Urban Affairs Subcommittee held a hearing to investigate MOHELA's record as a servicer and hear testimony from MOHELA's Chief Executive Officer, Scott Giles. MOHELA responded with a letter from its counsel stating without any explanation that Mr. Giles would not be able to testify at the hearing, and requesting that the Subcommittee hold the public hearing in abeyance and proceed with private briefings instead.

**8.    The September 2024 Letter to Secretary Cardona**

129.    On September 9, 2024, fifty members of Congress sent a letter (the "September 2024 Letter") to then-Secretary of Education Miguel Cardona.[38]

130.    In the September 2024 Letter, the members of Congress stated: "Given ongoing concerns about MOHELA's failures, we urge the Department of Education (ED) to immediately review whether MOHELA is meeting its contractual obligations as a student loan servicer and

---

05/Letter%20to%20ED%20re%20MOHELA%20failures.pdf.

[38]  Letter from Senators Warren *et. al.* and Members of Congress Thompson *et. al.* to Secretary of Education Miguel Cardona (Sept. 9, 2024),https://protectborrowers.org/wp-content/uploads/2024/09/congressional-letter-MOHELA-2024-09-10-092300.pdf.

implement any corrective measures necessary, including the potential termination of MOHELA's contract if warranted."

131.    The September 2024 Letter made reference to lawsuits filed by the American Federation of Teachers (AFT) and the Project on Predatory Student Lending (PPSL).

132.    The September 2024 Letter stated that, although MOHELA "received $1.1 billion to date to service student loans for 8 million borrowers," it kept making "what appear to be careless, blatant, and harmful violations of ED guidance exposed by the AFT and PPSL suits, [which] suggest, once again, that MOHELA cannot be trusted to meet its contractual obligations as a federal student loan servicer."

### G.    MOHELA'S Gross Servicing Failures Compromise the Implementation of the SAVE Plan and Harm Borrowers

133.    In October 2023, multiple news outlets and the Department revealed that more than 400,000 federal student loan borrowers were billed an incorrect monthly payment amount under IDR plans, including the newly implemented SAVE plan. Specifically, MOHELA used outdated 2022 federal poverty guidelines rather than the applicable 2023 figures to calculate borrowers' discretionary income. This error resulted in significantly inflated monthly payments for hundreds of thousands of borrowers, directly undermining the goals of the SAVE plan.

134.    In addition to miscalculating payment amounts, the Department found that MOHELA failed to send timely billing statements to approximately 2.5 million borrowers. These failures led to confusion, missed payments, and widespread borrower distress—just as federal student loan payments resumed after a three-year pandemic-related pause.

135.    As a result of these critical operational failures, the Department concluded that MOHELA had committed what it described as "gross servicing errors." In response, as discussed above, the Department announced it would withhold a $7.2 million monthly payment owed to

MOHELA under its federal servicing contract. This withholding was one of the most severe public enforcement actions taken against a federal student loan servicer in recent history and underscored the Department's assessment that MOHELA had breached its contractual obligations and failed to meet federally mandated servicing standards.

136.     These errors occurred during a period of heightened borrower vulnerability and system-wide transition, as payments resumed for the first time since March 2020. Rather than providing accurate information and effective support to borrowers, MOHELA's conduct imposed additional administrative and financial burdens on borrowers attempting to navigate an already complex system.

137.     The Department's enforcement action against MOHELA reflects the federal government's acknowledgment that MOHELA failed to fulfill its critical role as a federally contracted servicer. The financial consequences of MOHELA's failures have fallen primarily on borrowers, many of whom were misled, overcharged, or penalized due to MOHELA's gross failures.

**H.     MOHELA Fails to Implement the SAVE Plan in Compliance with the Department's Instructions and Applicable Law**

138.     MOHELA's widespread servicing failures during the rollout of the SAVE plan deprived borrowers of the economic protections and benefits promised under federal law. Rather than executing the SAVE plan in accordance with the Department's regulations, instructions and regulatory guidance, MOHELA's mismanagement and failures harmed borrowers, including by obstructing their access to lower monthly payments, interest relief, and eventual loan forgiveness.

139.     As described in more detail below, this lawsuit challenges three categories of major failures by MOHELA that harmed numerous borrowers throughout the United States:

a.      First, MOHELA failed to immediately and automatically provide borrowers on REPAYE with the benefits of the SAVE plan after July 2023, as MOHELA was required to do.

b.      Second, MOHELA failed to timely process borrowers' SAVE applications and failed to place SAVE applicants' loans in forbearance or the correct type of forbearance, as MOHELA was required to do.

c.      Third, after an administrative stay was entered on July 18, 2024, temporarily suspending the implementation of the remaining provisions of the SAVE plan, MOHELA failed to place borrowers' loans in administrative forbearance with a 0% interest rate, as MOHELA was required by the Department to do.

140.    The harms to borrowers were exacerbated by what has been described as a "call deflection" scheme that MOHELA implemented to avoid providing live customer support. This scheme was uncovered through public records requests and a detailed investigative report published by the American Federation of Teachers (AFT) and the Student Borrower Protection Center (SBPC) under the Missouri Sunshine Law.

141.    Internal documents revealed that MOHELA explicitly instructed its call center representatives to deflect borrowers from seeking or receiving live assistance. Representatives were directed to refer borrowers to MOHELA's website, the Department's Federal Student Aid portal, and other self-service options, rather than engage with them directly to resolve urgent or complex issues.

142.    MOHELA went so far as to request that the Department exclude its phone number from borrower-facing communications and instructed the Department to avoid language such as "call or chat with your servicer." These efforts reflect a deliberate attempt by MOHELA to avoid

- 37 -

accountability and limit borrower access to the very support that servicers are contractually obligated to provide.

143. Compounding these accessibility barriers, MOHELA's website—its primary self-service platform—was completely inaccessible to many borrowers from November 15 to December 12, 2023, due to unresolved login issues that MOHELA attributed to ongoing and undefined "server improvements." During this period, borrowers were effectively cut off from all means of managing their loan accounts or submitting an online SAVE plan application.

144. MOHELA itself identified at least 28 borrower account issues for which no self-service tools were available online. In other words, borrowers were explicitly told to use digital self-service options while MOHELA simultaneously admitted that many critical borrower needs could only be resolved through direct human interaction—support MOHELA intentionally suppressed.

145. Through these systemic failures and deliberate avoidance strategies, MOHELA failed to fulfill its legal obligations as a federal student loan servicer and materially interfered with borrowers' statutory rights under the HEA. These failures caused concrete harm, including financial losses administrative confusion, and loss of time toward loan forgiveness.

### 1. MOHELA Failed to Immediately and Automatically Provide Borrowers on REPAYE with the Benefits of the SAVE Plan

146. Pursuant to the regulations promulgated by the Department, MOHELA and other federal loan servicers were required, after July 30, 2023, to automatically apply certain important benefits of the newly implemented SAVE plan to all borrowers enrolled in the REPAYE plan, without requiring any additional action by the borrower.[39] This automatic conversion was a core

---

[39] *See* William D. Ford Federal Direct Loan Program, 34 C.F.R. § 685.209(f) (payment-threshold benefit), § 685.209(h) (nonaccrual of interest benefit); *see also* Improving Income Driven

part of the Department's phased rollout of the SAVE plan in 2023.

147.    Contrary to this directive, MOHELA failed to automatically provide all eligible REPAYE borrowers with the benefits of the SAVE plan. Worse, it erroneously instructed some borrowers to affirmatively apply for the SAVE plan, sowing confusion. These incorrect instructions directly contradicted public assurances by the government that no application would be required for REPAYE participants.[40]

148.    Compounding the harm, MOHELA also mistakenly transferred certain borrowers into the standard or "level" repayment plan, a fixed-payment plan that does not consider income and typically results in substantially higher monthly payments. Under a standard or level plan, borrowers pay a fixed monthly amount designed to repay the loan over a set period (usually 10 years for most loans, and up to 30 years for consolidated loans) regardless of the borrower's ability to pay.

149.    These erroneous transfers to higher-payment plans deprived borrowers of the core benefits of the SAVE plan, including lower income-based payments and protection against interest accumulation. Some borrowers experienced significant financial strain as a result,

---

Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 Fed. Reg. 43820, 43820 (July 10, 2023) (designating the payment-threshold and nonaccrual of interest benefits of the SAVE plan for early implementation beginning on July 30, 2023 pursuant to Section 482(c) of the HEA); *id.* at 43822 ("Borrowers currently enrolled on the REPAYE plan will not have to do anything to receive the benefits of the SAVE plan, and the new name will be reflected on written and electronic forms and records over time.").

[40] *See FACT SHEET: The Biden-Harris Administration Launches the SAVE Plan, the Most Affordable Student Loan Repayment Plan Ever to Lower Monthly Payments for Millions of Borrowers*, WHITE HOUSE BRIEFING ROOM (Aug. 22, 2023), https://bidenwhitehouse.archives.gov/briefing-room/statements-releases/2023/08/22/fact-sheet-the-biden-harris-administration-launches-the-save-plan-the-most-affordable-student-loan-repayment-plan-ever-to-lower-monthly-payments-for-millions-of-borrowers/ ("Borrowers who are already on the REPAYE plan will be automatically enrolled in the SAVE plan and see their payments automatically adjust with no action on their part.").

including overdrafts, missed payments and penalties, and disruption to household budgeting. Furthermore, borrowers were forced to allocate more payments towards interest that should not have been charged in the first place, rather than paying down their principal.

150.    In cases where borrowers who should have automatically received the benefits of the SAVE plan without applying, applied for the SAVE plan directly, whether out of confusion or necessity, MOHELA failed to timely review and process those applications, often leaving borrowers in limbo for weeks or months. During this period, affected borrowers were required to continue making payments under their previous, often higher, repayment plans, even though they were eligible for, and should automatically have had, substantially lower monthly obligations under SAVE.

151.    MOHELA's failure to comply with the Department's requirements regarding REPAYE enrollees and MOHELA's subsequent mishandling of borrower accounts represents a fundamental breach of its contractual and regulatory responsibilities. These failures not only undermined the Department's rollout of the SAVE plan but also caused borrowers to suffer immediate financial harm.

   2.    **MOHELA Failed to Process SAVE Applications in a Timely Manner, and Failed to Place SAVE Applicants' Loans in Forbearance or the Correct Type of Forbearance**

152.    Under Department guidance, MOHELA was required to process applications to the SAVE plan in a timely manner, consistent with both its federal Servicing Contracts and the statutory purpose of the HEA. Specifically, upon receipt of a borrower's SAVE plan application, MOHELA was required to place the borrower's loans into a temporary status known as processing forbearance, which lasts up to 60 days.[41] During this period, interest continues to

---

[41] *See* 34 C.F.R § 685.205(b)(9) (providing that the Secretary of the Department of Education

accrue, but borrowers are not required to make payments while the application is under review.

153.     Until August 1, 2025, if MOHELA failed to complete the processing of a SAVE application within the 60-day window, guidance from the Department of Education required that the borrower's account be placed into general administrative forbearance, a status under which interest did not accrue and the borrower continued to be protected from required monthly payments while waiting for resolution.[42]

154.     Under both the DL Contract and the USDS Contract, MOHELA is required to comply with all Department policies and guidelines, including the requirement to place borrowers with SAVE applications not processed within 60 days into zero-interest general forbearance. *See* Ex. A § C.1.4.3-4; Ex. B § C.3.1.d.

155.     MOHELA repeatedly failed to follow these protocols, resulting in extended delays, improper interest charges, and avoidable borrower confusion.

156.     In numerous cases, MOHELA failed to place borrowers with pending SAVE applications into general administrative forbearance even though their applications had remained unprocessed by MOHELA for more than 60 days. As a result, borrowers were left in interest-accruing processing forbearance when they should have been in general administrative

---

only grants administrative forbearance, during which interest accrues, for "up to 60 days").

[42] *See* U.S. Dep't of Educ., *Department of Education Updates on Saving on a Valuable Education (SAVE Plan)* (update as of Aug. 14, 2024) ("SAVE borrowers will not accrue interest on their loans during the forbearance."), accessible at https://web.archive.org/web/2024091909 0330/http://www.ed.gov/higher-education/manage-your-loans/save-plan; *id.* (update as of 1/15/25) ("Under this general forbearance…interest is not accruing."), accessible at https://web.archive.org/web/20250128181442/https://www.ed.gov/higher-education/manage-your-loans/save-plan. *See also See, e.g.*, U.S. Dep't of Educ., *U.S. Department of Education Continues to Improve Federal Student Loan Repayment Options* (July 9, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-continues-improve-federal-student-loan-repayment-options-addresses-illegal-biden-administration-actions (announcing SAVE zero-interest policy would end on August 1, 2025).

forbearance, in direct violation of Department policy and causing financial harm to borrowers.

157.    Examiners from the Consumer Financial Protection Bureau found that,

servicers engaged in unfair acts or practices when they caused consumers to experience excessive delays in processing times for IDR applications. In many reviewed files, it took more than 90 calendar days for servicers to process the IDR applications. These delays caused or were likely to cause substantial injury as interest continued to accrue while servicers processed IDR applications, so excessive delays likely resulted in unnecessary accrued interest. In addition, the delays may have prevented borrowers from making payments which count towards loan forgiveness. These delays also caused borrowers considerable frustration and wasted time as they repeatedly tried to obtain information from servicers about the status of their applications. Consumers could not reasonably avoid the injury because they do not choose their servicer and have no control of how long it takes servicers to review and evaluate borrowers' applications. The injury to consumers was not outweighed by countervailing benefits to consumers or to competition.[43]

158.    In other instances, MOHELA failed to place borrowers in any type of forbearance (i.e., not even processing forbearance) after receiving their SAVE applications, allowing payments to resume and interest to accrue as if no application had been submitted. Borrowers in these cases were penalized for attempting to access a benefit to which they were legally entitled and, after their applications remained unprocessed for more than 60 days, were further harmed by interest wrongfully continuing to accrue.

159.    MOHELA also wrongfully denied or canceled SAVE plan applications without providing any explanation, notice of deficiency, or meaningful opportunity for the borrower to correct supposed issues. This lack of transparency violates core principles of procedural fairness and directly contradicts Department guidance, which requires servicers to notify borrowers of

---

[43] See Cons. Fin. Prot. Bureau, *Supervisory Highlights: Special Edition Student Lending*, *ISSUE 36 (WINTER 2024)* (Dec. 16, 2024), https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights-special-ed-student-lending-issue-36-winter_2024-12.pdf.

any missing or deficient application materials.

160.    These failures caused harm, including financial harm, to borrowers, many of whom were relying on the SAVE plan as a means to manage their debt after the resumption of federal student loan repayment in late 2023. MOHELA's conduct failed to meet the minimum standards of accuracy, responsiveness, and good faith required of federal student loan servicers.

### 3.    MOHELA Failed to Place SAVE Borrowers' Loans in General Administrative Forbearance Following the July 18, 2024 Administrative Stay

161.    On April 9, 2024, the Attorneys General of seven states (the "States") filed suit against the Department in the U.S. District Court for the Eastern District of Missouri. The States asserted a variety of constitutional and statutory challenges to the SAVE plan, alleging that it exceeded the Department's statutory authority under the HEA and violated the Appropriations Clause of the U.S. Constitution and the Administrative Procedure Act (APA). The States sought to enjoin the implementation and enforcement of the SAVE plan in its entirety.

162.    On June 24, 2024, the district court granted in part the States' motion for preliminary injunction. The court agreed with the States that the loan forgiveness provisions of the SAVE plan raised serious legal questions and could potentially cause irreparable harm to the States. Accordingly, the court enjoined the implementation of the SAVE plan's forgiveness provisions pending final resolution of the case.

163.    However, the court **did not enjoin** the other components of the SAVE plan, including the revised payment-threshold provision and the nonaccrual of unpaid interest, which prevents loan balances from growing when borrowers make their required payments. These key borrower protections remained fully in effect following the district court's ruling.

164.    Therefore, if borrowers had their applications processed, they would have been able to benefit from those provisions while the partial injunction was in effect.

- 43 -

165.     The Department filed a notice of appeal of the district court's injunction to the U.S. Court of Appeals for the Eighth Circuit. At the same time, the States cross-appealed, arguing that the district court's partial injunction was too narrow and requesting that the court expand the injunction to cover the entire SAVE plan, including the repayment and interest provisions.

166.     The district court denied the States' request for an expanded injunction pending appeal. The States then renewed their request before the Eighth Circuit by filing an emergency motion for an injunction pending appeal, seeking to immediately suspend the implementation of all components of the SAVE plan while the appeal was pending.

167.     On July 18, 2024, the Eighth Circuit issued an administrative stay, temporarily suspending the implementation of the remaining provisions of the SAVE plan, including the payment-threshold and nonaccrual of interest features, pending resolution of the States' emergency motion. The administrative stay did not represent a ruling on the merits but functioned as a procedural pause to preserve the status quo while the court considered the States' motion for a broader injunction.

168.     Immediately after the Eighth Circuit's administrative stay was issued, the Department directed and announced that borrowers who were on the SAVE plan when the stay was issued would be placed in administrative forbearance with a 0% interest rate:

> Borrowers enrolled in the SAVE Plan will be placed in an interest-free forbearance while our Administration continues to vigorously defend the SAVE Plan in court.[44]

---

[44] U.S. Dep't of Educ., *Statement from U.S. Secretary of Education Miguel Cardona on the 8th Circuit Court of Appeals' Ruling on Biden-Harris Administration's Saving a Valuable Education (SAVE) Plan* (July 19, 2024), https://web.archive.org/web/20240719140539/https://www.ed.gov/news/press-releases/statement-us-secretary-education-miguel-cardona-8th-circuit-court-appeals-ruling-

169.     Accordingly, the Department instructed servicers not to bill borrowers on the SAVE plan and specified that their loans should not accrue interest while the litigation was ongoing.

170.     Contrary to the Department's direction, SAVE plan borrowers whose loans were serviced by MOHELA began reporting that interest was in fact accruing on their loan balances after the Department's direction. These borrowers also reported receiving billing notices or seeing interest added to their accounts in their online loan dashboards.

171.     On August 9, 2024, the Eighth Circuit granted the States' motion for a preliminary injunction pending appeal. It enjoined the Department "from any further forgiveness of principal or interest, from not charging borrowers accrued interest, and from further implementing SAVE's payment-threshold provisions." *Missouri v. Biden*, 112 F.4th 531, 538 (8th Cir. 2024).

172.     On February 18, 2025, the Eighth Circuit issued its decision on the merits of the States' appeal. It affirmed the district court's entry of the preliminary injunction and remanded for further proceedings, with instructions to modify the preliminary injunction to enjoin the entire SAVE plan.

173.     On April 14, 2025, the district court complied with the Eighth Circuit's mandate by modifying its injunction to block the entirety of the SAVE plan.

174.     With the SAVE plan now in limbo, the Department of Education's direction that SAVE plan loans maintain zero-interest forbearance remained in effect, i.e., the same as after the July 18, 2024 stay was issued.[45] Thus, all borrowers on the SAVE plan were not to be charged

---

biden-harris-administrations-saving-valuable-education-save-plan.

[45] *See, e.g.*, U.S. Dep't of Educ., *U.S. Department of Education Continues to Improve Federal Student Loan Repayment Options* (July 9, 2025), https://www.ed.gov/about/news/press-

- 45 -

any interest (or to make any monthly payments) while the injunction remained in effect.

175.    Beginning on or about June 2, 2025, MOHELA issued formal notices to borrowers on the SAVE plan:

> In an effort to keep you updated on your federal loan(s), we have enclosed details about your loans), including the accrued interest, interest rate, and total balance . . . . The loan(s) listed in this letter are currently in forbearance. Although no payments are due at this time, interest continues to accrue on your loan(s) during the forbearance period. You have the option to pay the interest during forbearance.[46]

176.    MOHELA's statement regarding interest continuing to accrue during the forbearance period was directly contrary to what the Department directed MOHELA to do in servicing these borrowers' accounts. It also generated severe and widespread borrower confusion.

177.    In response, MOHELA posted a public notice to borrowers on the SAVE plan. The notice stated: "If you recently received an interest notice for your student loan account, please know that this is not a bill, and no action is necessary at this time. For borrowers on the SAVE administrative forbearance, interest is currently set at 0%."

178.    Despite these representations and the Department's direction that these loans were to remain in interest-free forbearance, with no interest accruing, while the injunction was in place, many borrowers saw thousands of dollars in interest added to their loan balance during this period. MOHELA has not corrected this egregious servicing error.

---

release/us-department-of-education-continues-improve-federal-student-loan-repayment-options-addresses-illegal-biden-administration-actions (marking the first time the Department announced changes to SAVE zero-interest policy).

[46] Adam S. Minsky, *Borrowers Receive Misleading Student Loan Interest Notices — Here's What to Know*, FORBES (June 6, 2025), https://www.forbes.com/sites/adamminsky/2025/06/06/borrowers-receive-misleading-student-loan-interest-notices---heres-what-to-know/.

179.  On July 1, 2025, the President signed the "One Big, Beautiful Bill." With this bill, Congress elected to extend access to the SAVE plan until July 1, 2028. Specifically, it phases out the SAVE, ICR, and PAYE plans while giving borrowers until July 1, 2028 to change their repayment plan.

180.  On July 9, 2025, the Department announced that interest accrual would resume on August 1, 2025 for borrowers on the SAVE plan.

181.  MOHELA posted a notice on its website announcing that interest would start accruing again for borrowers on the SAVE plan:

> In July 2024, a federal court injunction blocked parts of the SAVE Plan. As a result, eligible federal student loans *were placed in forbearance with a 0% interest rate*. During this forbearance interest had not accrued; therefore, loan balances (including principal and interest) have not increased during this forbearance. You will not have to make payments until the SAVE forbearance ends. In February 2025, a second federal court injunction ended the SAVE 0% interest rate. To comply with this injunction, loan(s) in the SAVE Administrative Forbearance began accruing interest on August 1, 2025.[47]

182.  MOHELA was thus required—but failed—to place borrowers enrolled in the SAVE plan in interest-free forbearance from July 18, 2024 to August 1, 2025.

### I.  The Department of Education Stops Assigning Federal Student Loan Accounts to MOHELA and Transfers Loans to Other Servicers

183.  In October 2024, the Department of Education announced that it would temporarily stop assigning new borrower accounts to MOHELA. The Department expressed concern for MOHELA's failure to "process hundreds of thousands of applications for income-

---

[47] MOHELA, *Changes to the SAVE Administrative Forbearance*, https://mohela.studentaid.gov/DL/resourceCenter/SAVEAdministrativeForbearance.aspx (emphasis supplied) (last visited Nov. 18, 2025).

driven repayment plans[.]"[48]

184.     The Department noted that MOHELA has "amassed a substantial backlog and did not inform the agency of the problem."

185.     The Department also accused MOHELA of failing to "implement the Save plan on time, resulting in billing delays and 280,000 borrowers being placed in forbearance" and "incorrectly capitalizing interest on borrowers' accounts, causing balances to increase, and not transferring files on time, among other problems."

186.     In July 2025, the Department announced that it would begin transferring federal student loans in MOHELA's portfolio to other servicers by the end of 2025.[49] The Department's action was attributed by one U.S. Senator to "MOHELA's abysmal performance" and the need "to improve MOHELA's performance."[50]

### J.     Multiple State Attorneys General Investigate MOHELA for Gross Servicing Failures

187.     On April 28, 2025, news outlets reported that MOHELA was under investigation by multiple state attorneys general for "frequent errors handling basic administrative tasks like calculating monthly payments, billing customers, and processing paperwork" — "mistakes that often turned costly for borrowers and the servicer was slow to fix[.]"[51]

---

[48] Danielle Douglas-Gabriel, *Student Loan Servicer MOHELA Faces New Punishment from Biden Administration*, WASH. POST (Oct. 17, 2025), https://www.washingtonpost.com/education/2024/10/16/mohela-student-loans-punishment/.

[49] Adam S. Minsky, *Student Loans with This Servicer Will Be Transferred within Months, Says Department of Education*, FORBES (Aug. 20, 2025), https://www.forbes.com/sites/adamminsky/2025/08/20/student-loans-with-this-servicer-will-be-transferred-within-months-says-department-of-education/.

[50] *Id.*

[51] Jordan Weissman, *Widely criticized student loan servicer MOHELA faces investigation by multiple state attorneys general*, YAHOO! FINANCE (Apr. 28, 2025), https://finance.yahoo.com/news/widely-criticized-student-loan-servicer-mohela-faces-investigation-by-multiple-state-attorneys-general-100000033.html.

188.    The state investigations reportedly began in late 2023 and scrutinize allegations that MOHELA committed a "shocking series of abuses" against its customers and actively "misleads and misinforms borrowers" about their repayment options.[52]

## V.    PLAINTIFF-SPECIFIC ALLEGATIONS

### A.    Jonathan Gibbs

189.    Plaintiff Jonathan Gibbs graduated in 2022 with a Doctor of Osteopathic Medicine degree.

190.    To finance the cost of tuition for his education, Gibbs took out 10 federal student loans.

191.    During the application process, before Gibbs's loans were disbursed, Gibbs and the Department executed a Master Promissory Note (MPN) governing the terms of Gibbs's loans.

192.    Beginning in or around 2017, MOHELA began servicing Gibbs's loans.

193.    Gibbs initially was on a standard repayment plan, then transferred to the REPAYE plan on or around June 10, 2022.

194.    After the COVID-19 payment pause ended, Gibbs's loans were to be placed back on repayment status and the first payment was to be due on October 1, 2023.

195.    Gibbs did not have to apply to the SAVE plan to receive its benefits. Instead, MOHELA should have automatically converted his loans to the SAVE plan and begun implementing the SAVE plan's provisions starting on October 1, 2023.

196.    MOHELA failed to provide Gibbs with the benefits of the SAVE plan beginning on October 1, 2023, as required by the Department's explicit directives.

---

[52] *Id.*

197.     MOHELA failed to adjust Gibbs's monthly payment amount in accordance with 34 C.F.R. § 685.209(f), the Department's explicit instructions to federal student loan servicers, and MOHELA's obligations pursuant to its contracts with the Department.

198.     But for MOHELA's servicing failure, Gibbs's monthly payment amount would have been calculated based on the SAVE plan's new formula, which would have lowered Gibbs's monthly payment amount.

199.     Further, MOHELA charged Gibbs unpaid accrued interest in violation of 34 C.F.R. § 685.209(h)(1), the Department's explicit instructions to federal student loan servicers, and MOHELA's obligations pursuant to its contracts with the Department. This wrongfully charged interest was a direct result of MOHELA's servicing failure.

200.     MOHELA provided no explanation to Gibbs for its failure to implement the SAVE plan and apply its benefits to Gibbs's loans.

201.     Following the issuance of the Injunction on July 18, 2024, MOHELA also failed to place Gibbs's loans in an interest-free forbearance status, as the Department had specifically instructed and as MOHELA itself had publicly announced.

202.     As a result, Gibbs's loans continued to accrue interest following the issuance of the injunction, in violation of the Department's explicit instructions to federal student loan servicers, and MOHELA's obligations pursuant to its contracts with the Department.

203.     MOHELA failed to correct the issue by waiving or reimbursing any of the unlawfully charged interest.

### B.     Susan Hart

204.     To finance the cost of tuition for her undergraduate education, Plaintiff Susan Hart took out federal student loans. Those loans were serviced by Aidvantage.

205.     During the application process, before Hart's loans were disbursed, Hart and the

Department executed a Master Promissory Note (MPN) governing the terms of Hart's loans.

206. Beginning on February 26, 2020, MOHELA began servicing Hart's loans, which she repaid.

207. Hart graduated in 2023 with a Doctor of Philosophy in Nursing Education. She took out additional loans to finance the cost of tuition for graduate school.

208. On or around January 1, 2024, Hart submitted a written application to transfer her loans to the SAVE plan.

209. MOHELA failed to process Hart's application within 60 days, as instructed by the Department.

210. After 60 days passed following the submission of Hart's application, MOHELA failed to transfer Hart's loans to an interest-free general forbearance as instructed by the Department.

211. As a result, Hart's loans accrued interest in violation of the Department's explicit instructions that loans should be placed on general forbearance if applications have not been processed within 60 days of submission. This wrongfully accrued interest was a direct result of MOHELA's servicing failures, in violation of the Department's explicit instructions to federal student loan servicers, and MOHELA's obligations pursuant to its contracts with the Department. MOHELA failed to correct the issue by waiving or reimbursing any of the unlawfully charged interest.

212. Following the issuance of the Injunction on July 18, 2024, MOHELA failed to place Hart's loans in an interest-free forbearance, as the Department had specifically instructed and MOHELA itself had publicly announced.

213. As a result, Hart's loans continued to accrue interest following the issuance of the

- 51 -

injunction, in violation of the Department's explicit instructions to federal student loan servicers, and MOHELA's obligations pursuant to its contracts with the Department.

214.    MOHELA failed to correct the issue by waiving or reimbursing any of the unlawfully charged interest.

### C.    Jacob Lehman

215.    Plaintiff Jacob Lehman graduated in 2020 with a Doctor of Medicine degree.

216.    To finance the cost of tuition for his education, Lehman took out 10 federal student loans.

217.    During the application process, before Lehman's loans were disbursed, Lehman and the Department executed a Master Promissory Note (MPN) governing the terms of Lehman's loans.

218.    Lehman's loans were initially serviced by EdFinancial.

219.    Beginning on June 3, 2020, MOHELA began servicing Lehman's loans.

220.    Lehman initially selected the REPAYE plan to pay back his loans.

221.    After the COVID-19 payment pause ended, Lehman's loans were placed back on repayment status and the first payment was due on October 1, 2023.

222.    Lehman did not have to apply to the SAVE plan to receive its benefits. Instead, MOHELA should have automatically converted his loans to the SAVE plan and begun implementing the SAVE plan's provisions starting on October 1, 2023. MOHELA failed to sufficiently inform Lehman that he did not need to submit an application to the SAVE plan in order for his loans to be placed on it. As a result, Lehman submitted an application to the SAVE plan on June 23, 2024.

223.    MOHELA failed to provide Lehman with the benefits of the SAVE plan beginning on October 1, 2023, as required by the Department's explicit directives.

224.    MOHELA failed to adjust Lehman's monthly payment amount in accordance with 34 C.F.R. § 685.209(f), the Department's explicit instructions to federal student loan servicers, and MOHELA's obligations pursuant to its contracts with the Department.

225.    But for MOHELA's servicing failure, Lehman's monthly payment amount would have been calculated based on the SAVE plan's new formula, which would have lowered Lehman's monthly payment amount.

226.    Further, MOHELA charged Lehman unpaid accrued interest in violation of 34 C.F.R. § 685.209(h)(1), the Department's explicit instructions to federal student loan servicers, and MOHELA's obligations pursuant to its contracts with the Department. This wrongfully charged interest was a direct result of MOHELA's servicing failure.

227.    MOHELA provided no explanation to Lehman for its failure to implement the SAVE plan and apply its benefits to Lehman's loans.

228.    On June 23, 2024, Lehman submitted a written application to transfer his loans to the SAVE plan.

229.    MOHELA failed to process Lehman's application within 60 days, as instructed by the Department.

230.    After 60 days passed following the submission of Lehman's application, MOHELA failed to transfer Lehman's loans to an interest-free general forbearance as instructed by the Department.

231.    As a result, Lehman's loans accrued interest in violation of the Department's explicit instructions that loans should be placed on general forbearance if applications have not been processed within 60 days of submission. This wrongfully accrued interest was a direct result of MOHELA's servicing failures, in violation of the Department's explicit instructions to

- 53 -

federal student loan servicers, and MOHELA's obligations pursuant to its contracts with the Department.

232.    Following the issuance of the Injunction on July 18, 2024, MOHELA also failed to place Lehman's loans in an interest-free forbearance status, as the Department had specifically instructed and as MOHELA itself had publicly announced.

233.    As a result, Lehman's loans continued to accrue interest following the issuance of the injunction, in violation of the Department's explicit instructions to federal student loan servicers, and MOHELA's obligations pursuant to its contracts with the Department.

234.    MOHELA failed to correct the issue by waiving or reimbursing any of the unlawfully charged interest.

### D.    <u>Annette A. Robbins</u>

235.    Plaintiff Annette Robbins graduated in 2020 with a Doctorate Degree in Nursing Practice.

236.    To finance the cost of tuition for her education, Robbins took out 11 federal student loans.

237.    During the application process, before Robbins's loans were disbursed, Robbins and the Department executed a Master Promissory Note (MPN) governing the terms of Robbins's loans.

238.    Robbins's loans were initially serviced by NelNet.

239.    Immediately prior to the COVID-19 payments pause, Robbins was repaying her loans pursuant to PAYE.

240.    Beginning on May 20, 2024, MOHELA began servicing Robbins's loans.

241.    On April 28, 2024, Robbins submitted a written application to transfer her loans to the SAVE plan.

242.    MOHELA failed to process Robbins's application within 60 days, as instructed by the Department.

243.    After 60 days passed following the submission of Robbins's application, MOHELA failed to transfer Robbins's loans to an interest-free general forbearance as instructed by the Department.

244.    As a result, Robbins's loans accrued interest in violation of the Department's explicit instructions that loans should be placed on general forbearance if applications have not been processed within 60 days of submission. This wrongfully accrued interest was a direct result of MOHELA's servicing failures, in violation of the Department's explicit instructions to federal student loan servicers, and MOHELA's obligations pursuant to its contracts with the Department.

245.    Following the issuance of the Injunction on July 18, 2024, MOHELA failed to place Robbins's loans in an interest-free forbearance, as the Department had specifically instructed and MOHELA itself had publicly announced.

246.    As a result, Robbins's loans continued to accrue interest following the issuance of the injunction, in violation of the Department's explicit instructions to federal student loan servicers, and MOHELA's obligations pursuant to its contracts with the Department.

247.    MOHELA failed to correct the issue by waiving or reimbursing any of the unlawfully charged interest.

### E.    Arthur Sprogis

248.    Plaintiff Arthur Sprogis graduated in 2012 with a Master's Degree in International Affairs.

249.    To finance the cost of tuition for his education, Sprogis took out eight federal student loans.

250. During the application process, before Sprogis's loans were disbursed, Sprogis and the Department executed a Master Promissory Note (MPN) governing the terms of Sprogis's loans.

251. Sprogis's loans were initially serviced by Great Lakes and FedLoan Servicing.

252. Beginning in or around 2022, MOHELA began servicing Sprogis's loans.

253. Sprogis initially selected the Income-Based Repayment plan and eventually switched to the REPAYE plan on August 26, 2019.

254. After the COVID-19 payment pause ended, Sprogis's loans were placed back on repayment status and the first payment was due on October 1, 2023.

255. Sprogis did not have to apply to the SAVE plan to receive its benefits. Instead, MOHELA should have automatically converted his loans to the SAVE plan and begun implementing the SAVE plan's provisions starting on October 1, 2023.

256. MOHELA failed to provide Sprogis with the benefits of the SAVE plan beginning on October 1, 2023, as required by the Department's explicit directives.

257. MOHELA failed to adjust Sprogis's monthly payment amount in accordance with 34 C.F.R. § 685.209(f), the Department's explicit instructions to federal student loan servicers, and MOHELA's obligations pursuant to its contracts with the Department. Instead, Sprogis's monthly payment amount remained the same as it was prior to the SAVE plan's effective date.

258. But for MOHELA's servicing failure, Sprogis's monthly payment amount would have been calculated based on the SAVE plan's new formula, which would have lowered Sprogis's monthly payment amount.

259. Further, MOHELA charged Sprogis unpaid accrued interest in violation of 34 C.F.R. § 685.209(h)(1), the Department's explicit instructions to federal student loan servicers,

and MOHELA's obligations pursuant to its contracts with the Department. This wrongfully charged interest was a direct result of MOHELA's servicing failure.

260. MOHELA provided no explanation to Sprogis for its failure to implement the SAVE plan and apply its benefits to Sprogis's loans.

261. Following the issuance of the Injunction on July 18, 2024, MOHELA also failed to place Sprogis's loans in an interest-free forbearance status, as the Department had specifically instructed and as MOHELA itself had publicly announced.

262. As a result, Sprogis's loans continued to accrue interest following the issuance of the injunction, in violation of the Department's explicit instructions to federal student loan servicers, and MOHELA's obligations pursuant to its contracts with the Department.

263. MOHELA failed to correct the issue by waiving or reimbursing any of the unlawfully charged interest.

### F. Pamela Yango

264. Plaintiff Pamela Yango graduated from the University of San Francisco in 2007 with a Bachelor of Science in Physics and Biology. Ms. Yango subsequently enrolled in the Post-Baccalaureate Program at Boston University, which she completed in 2009.

265. To finance the cost of her education, Yango took out eighteen federal student loans.

266. During the application process, before Yango's loans were disbursed, Yango and the Department executed a Master Promissory Note (MPN) governing the terms of Yango's loans.

267. MOHELA began servicing Yango's loans beginning on or around January 8, 2015.

268. Yango enrolled in the REPAYE plan to pay back her loans in or around 2020.

269.     After the COVID-19 payment pause ended, Yango's loans were placed back on repayment status and the first payment was due on October 1, 2023.

270.     Yango did not have to apply to the SAVE plan to receive its benefits. Instead, MOHELA should have automatically converted her loans to the SAVE plan and begun implementing the SAVE plan's provisions starting on October 1, 2023.

271.     MOHELA failed to sufficiently inform Yango that she did not need to submit an application to the SAVE plan in order for her loans to be placed on it. As a result, Yango submitted applications to the SAVE plan on or around September 21, 2023 and June 27, 2024.

272.     MOHELA failed to provide Yango with the benefits of the SAVE plan beginning on October 1, 2023, as required by the Department's explicit directives.

273.     MOHELA failed to adjust Yango's monthly payment amount in accordance with 34 C.F.R. § 685.209(f), the Department's explicit instructions to federal student loan servicers, and MOHELA's obligations pursuant to its contracts with the Department. Instead, Yango's monthly payment amount remained the same as it was prior to the SAVE plan's effective date.

274.     But for MOHELA's servicing failure, Yango's monthly payment amount would have been calculated based on the SAVE plan's new formula, which would have lowered Yango's monthly payment amount.

275.     Further, MOHELA charged Yango unpaid accrued interest in violation of 34 C.F.R. § 685.209(h)(1), the Department's explicit instructions to federal student loan servicers, and MOHELA's obligations pursuant to its contracts with the Department. This wrongfully charged interest was a direct result of MOHELA's servicing failure.

276.     MOHELA provided no explanation to Yango for its failure to implement the SAVE plan and apply its benefits to Yango's loans.

- 58 -

277.    Following the issuance of the Injunction on July 18, 2024, MOHELA also failed to place Yango's loans in an interest-free forbearance status, as the Department had specifically instructed and as MOHELA itself had publicly announced.

278.    As a result, Yango's loans continued to accrue interest following the issuance of the injunction, in violation of the Department's explicit instructions to federal student loan servicers, and MOHELA's obligations pursuant to its contracts with the Department.

279.    MOHELA failed to correct the issue by waiving or reimbursing any of the unlawfully charged interest.

## VI.    CLASS ACTION ALLEGATIONS

280.    Pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiffs seek certification of the following classes and subclasses:

(1)    SAVE Benefits Class: All persons who are residents of the United States who had one or more federally held student loan(s) on a REPAYE plan serviced by MOHELA as of July 30, 2023 and who did not receive the benefits of the SAVE plan for those loans beginning on July 30, 2023.

The SAVE Benefits Class includes the following statutory subclasses:

(a)    New York SAVE Benefits Subclass:  All persons in the SAVE Benefits Class who are New York residents.

(b)    Washington SAVE Benefits Subclass:  All persons in the SAVE Benefits Class who are Washington residents.

(2)    Application Processing Class:  All persons who are residents of the United States who had one or more federally held student loan(s) serviced by MOHELA; submitted an application to MOHELA for enrollment in the SAVE plan between July 10, 2023 and July 18, 2024; and: (a) were not placed in either processing forbearance or general administrative forbearance during any part of Days 1 through 60 of the processing of their SAVE application, and/or (b) their SAVE application was not processed within 60 days of submission.

The Application Processing Class includes the following statutory subclasses:

(a) Florida Application Processing Subclass:  All persons in the Application Processing Class who are Florida residents.

(b) Washington Application Processing Subclass:  All persons in the Application Processing Class who are Washington residents.

(3) Post-Stay Interest Class:  All persons who are residents of the United States who had one or more federally held student loan(s) on the SAVE plan serviced by MOHELA as of July 18, 2024 that was not held in interest-free forbearance (i.e., it accrued interest) at any time between July 18, 2024 and July 31, 2025.

The Post-Stay Interest Class includes the following statutory subclasses:

(a) Florida Post-Stay Interest Subclass:  All persons in the Post-Stay Interest Class who are Florida residents.

(b) New York Post-Stay Interest Subclass:  All persons in the Post-Stay Interest Class who are New York residents.

(c) Washington Post-Stay Interest Subclass:  All persons in the Post-Stay Interest Class who are Washington residents.

281. Excluded from the proposed classes and subclasses are the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of MOHELA. Also excluded from the proposed classes and subclasses are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

282. Plaintiffs reserve the right to modify or amend the class and/or subclass definitions.

283. **Class identity**:  Members of each class and subclass are readily identifiable and ascertainable. MOHELA and/or its affiliates, among others, possess the information to identify and contact class members.

284. **Numerosity**:  Members of each class and subclass are so numerous that joinder of all members is impracticable. MOHELA services nearly eight million borrowers of federally

held student loans, substantial portions of whom were enrolled in the REPAYE plan and/or SAVE plan and/or applied for enrollment in the SAVE plan during the relevant periods.

285.    **Typicality**:  Plaintiffs' claims are typical of the claims of members of each class and subclass they seek to represent. All members' claims arise out of the same course of conduct by MOHELA and have been injured by MOHELA's misconduct in the same ways, and their claims are based on the same legal theories.

286.    **Adequacy**:  Plaintiffs will fairly and adequately protect the interests of the classes and subclasses. Plaintiffs have no known interests antagonistic to those of class members and their interests are aligned with class members' interests. Plaintiffs have also retained competent counsel with significant experience litigating complex and commercial class actions.

287.    **Commonality and Predominance**:  There are questions of law and fact common to members of each class and subclass Plaintiffs seek to represent such that there is a well-defined community of interest in this litigation. These common questions predominate over any questions affecting only individual class members. The common questions of law and fact include, without limitation:

a.    Whether MOHELA failed to provide the SAVE Benefits Class members benefits of the SAVE plan;

b.    Whether MOHELA failed to place the Application Processing Class members' loans into processing forbearance and/or general administrative forbearance while their SAVE applications remained unprocessed;

c.    Whether MOHELA failed to place the Post-Stay Interest Class members' loans into interest-free forbearance;

d.    Whether MOHELA's conduct breached the Servicing Contracts;

- 61 -

      e.      Whether Plaintiffs and the class and subclass members are third-party beneficiaries of the Servicing Contracts;

      f.      Whether MOHELA's conduct breached the Master Promissory Notes;

      g.      Whether MOHELA's conduct was unlawful and/or unfair;

      h.      Whether the class members were damaged;

288.      MOHELA has engaged in a common course of conduct, and Plaintiffs and members of each class and subclass have been similarly impacted by MOHELA's failure to comply with federal and state laws and regulations.

289.      **Superiority**:  A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most if not all class members would find the cost of litigating their individual claims prohibitively high and have no effective remedy. The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members and risk inconsistent treatment of claims arising from the same set of facts and occurrences. Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under the applicable rules.

290.      Additionally, MOHELA has acted or refused to act on grounds generally applicable to the class and subclass members, thereby making appropriate corresponding injunctive and/or declaratory relief with respect to the classes and subclasses as a whole, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure.

## VII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Breach of Contract, on Behalf of Plaintiffs Gibbs, Lehman, Sprogis, and Yango and the SAVE Benefits Class)**

291.    Plaintiffs restate and incorporate by reference the allegations in all paragraphs above as though fully set forth herein.

292.    At all relevant times, MOHELA was a party to and bound by one of two Servicing Contracts, under which MOHELA agreed to service federally held student loans on behalf of the Department of Education. Specifically, MOHELA entered into the DL Contract with the Department of Education on or around September 27, 2011. MOHELA entered into the USDS Contract with the Department of Education on or around April 24, 2023. As a party and a signatory to each of the Servicing Contracts, MOHELA is liable thereunder.

293.    The Servicing Contracts expressly provided that MOHELA would service loans in compliance with all applicable federal and state laws, rules, regulations, and Department of Education guidelines, for the benefit of borrowers such as Plaintiffs and class members.

294.    At all relevant times, Plaintiffs and class members were intended third-party beneficiaries of the Servicing Contracts, as the Servicing Contracts were entered into for the express purpose of providing loan servicing to borrowers, and Plaintiffs' rights and interests were the direct and intended object of the contract.

295.    Moreover, the Servicing Contracts reflect a clear intent to permit enforcement by borrowers. For example, the Servicing Contracts both contain express provisions that disclaim liability on the part of the Department of Education for non-compliant servicing caused by MOHELA—including but not limited to the failure to service borrower accounts in compliance with statutory or regulatory requirements, the terms of the Servicing Contract, or Department of Education guidance.

296.     At all relevant times, Plaintiffs and class members entered into Master Promissory Notes (MPNs) with the Department of Education for the issuance and repayment of federally held student loans. Among other things, the MPNs required the Department of Education to service Plaintiffs' loans and the loans of class members in accordance with federal law. The MPNs also stated that the Department of Education may contract with loan servicers to process student loan payments, deferment and forbearance requests, and other transactions, and to answer questions about those loans.

297.     At all relevant times, MOHELA acted as a loan servicer for Plaintiffs' and class members' student loans, pursuant to an assignment or delegation of loan servicing rights and obligations from the Department of Education. Specifically, by entering into the Servicing Contracts with the Department of Education, MOHELA accepted assignment of loan servicing rights and obligations set forth in the Master Promissory Notes and thus became an assignee thereof. Thus, at all relevant times, Plaintiffs and class members were in a contractual relationship with MOHELA, as assignee under the Master Promissory Notes.

298.     As an assignee of the Department of Education under the Master Promissory Notes, MOHELA assumed the Department of Education's contractual obligations to Plaintiffs and class members, including but not limited to the obligation to service the loan in accordance with governing laws and regulations, as well as the terms of the Master Promissory Notes.

299.     At all relevant times, Plaintiffs and class members performed all, or materially all, obligations imposed on them, if any, under the Servicing Contracts and the Master Promissory Notes, or such obligations have been waived.

300.     As set forth above, MOHELA materially breached the Servicing Contracts and the Master Promissory Notes by failing to administer each of Plaintiffs' loans and the loans of

class members in accord with federal law. Specifically, MOHELA failed to immediately and automatically provide borrowers on REPAYE with the benefits of the SAVE plan beginning on July 30, 2023, as was required by federal law and the Department's guidance, in violation of the terms of the Servicing Contracts and the Master Promissory Notes.

301.    As a direct and proximate result of MOHELA's breaches of the Servicing Contracts and the Master Promissory Notes, Plaintiffs and class members have suffered damages.

**SECOND CLAIM FOR RELIEF**
**(Breach of Contract, on Behalf of Plaintiffs Hart, Lehman, and Robbins and the Application Processing Class)**

302.    Plaintiffs restate and incorporate by reference the allegations in all paragraphs above as though fully set forth herein.

303.    At all relevant times, MOHELA was a party to and bound by one of two Servicing Contracts, under which MOHELA agreed to service federally held student loans on behalf of the Department of Education. Specifically, MOHELA entered into the DL Contract with the Department of Education on or around September 27, 2011. MOHELA entered into the USDS Contract with the Department of Education on or around April 24, 2023. As a party and a signatory to each of the Servicing Contracts, MOHELA is therefore liable thereunder.

304.    The Servicing Contracts expressly provided that MOHELA would service loans in compliance with all applicable federal and state laws, rules, regulations, and Department of Education guidelines, for the benefit of borrowers such as Plaintiffs and class members.

305.    At all relevant times, Plaintiffs and class members were intended third-party beneficiaries of the Servicing Contracts, as the Servicing Contracts were entered into for the express purpose of providing loan servicing to borrowers, and Plaintiffs' rights and interests

- 65 -

were the direct and intended object of the contract.

306.    Moreover, the Servicing Contracts reflect a clear intent to permit enforcement by borrowers. For example, the Servicing Contracts both contain express provisions that disclaim liability on the part of the Department of Education for non-compliant servicing caused by MOHELA—including but not limited to the failure to service borrower accounts in compliance with statutory or regulatory requirements, the terms of the Servicing Contract, or Department of Education guidance.

307.    At all relevant times, Plaintiffs and class members entered into Master Promissory Notes (MPNs) with the Department of Education for the issuance and repayment of federally held student loans. Among other things, the MPNs required the Department of Education to service Plaintiffs' loans and the loans of class members in accordance with federal law. The MPNs also stated that the Department of Education may contract with loan servicers to process student loan payments, deferment and forbearance requests, and other transactions, and to answer questions about those loans.

308.    At all relevant times, MOHELA acted as a loan servicer for Plaintiffs' and class members' student loans, pursuant to an assignment or delegation of loan servicing rights and obligations from the Department of Education. Specifically, by entering into the Servicing Contracts with the Department of Education, MOHELA accepted assignment of loan servicing rights and obligations set forth in the Master Promissory Notes and thus became an assignee thereof. Thus, at all relevant times, Plaintiffs and class members were in a contractual relationship with MOHELA, as assignee under the Master Promissory Notes.

309.    As an assignee of the Department of Education under the Master Promissory Notes, MOHELA assumed the Department of Education's contractual obligations to Plaintiffs

and class members, including but not limited to the obligation to service the loan in accordance with governing laws and regulations, as well as the terms of the Master Promissory Notes.

310.    At all relevant times, Plaintiffs and class members performed all, or materially all, obligations imposed on them, if any, under the Servicing Contracts and the Master Promissory Notes, or such obligations have been waived.

311.    As set forth above, MOHELA materially breached the Servicing Contracts and the Master Promissory Notes by failing to administer each of Plaintiffs' loans and the loans of class members in accord with federal law. Specifically, for borrowers who filed SAVE applications with MOHELA, MOHELA (a) failed to place them either in processing forbearance or general administrative forbearance during days 1 through 60 of when their SAVE applications were in process; and/or (b) failed to place them in general administrative forbearance after their SAVE applications had been pending for more than 60 days, as was required by federal law and the Department's guidance, in violation of the terms of the Servicing Contracts and the Master Promissory Notes.

312.    As a direct and proximate result of MOHELA's breaches of the Servicing Contracts and the Master Promissory Notes, Plaintiffs and class members have suffered damages.

**THIRD CLAIM FOR RELIEF**
**(Breach of Contract, on Behalf of Plaintiffs Gibbs, Hart, Lehman, Robbins, Sprogis, and Yango and the Post-Stay Interest Class)**

313.    Plaintiffs restate and incorporate by reference the allegations in all paragraphs above as though fully set forth herein.

314.    At all relevant times, MOHELA was a party to and bound by one of two Servicing Contracts, under which MOHELA agreed to service federally held student loans on

behalf of the Department of Education. Specifically, MOHELA entered into the DL Contract with the Department of Education on or around September 27, 2011. MOHELA entered into the USDS Contract with the Department of Education on or around April 24, 2023. As a party and a signatory to each of the Servicing Contracts, MOHELA is therefore liable thereunder.

315. The Servicing Contracts expressly provided that MOHELA would service loans in compliance with all applicable federal and state laws, rules, regulations, and Department of Education guidelines, for the benefit of borrowers such as Plaintiffs and class members.

316. At all relevant times, Plaintiffs and class members were intended third-party beneficiaries of the Servicing Contracts, as the Servicing Contracts were entered into for the express purpose of providing loan servicing to borrowers, and Plaintiffs' rights and interests were the direct and intended object of the contract.

317. Moreover, the Servicing Contracts reflect a clear intent to permit enforcement by borrowers. For example, the Servicing Contracts both contain express provisions that disclaim liability on the part of the Department of Education for non-compliant servicing caused by MOHELA—including but not limited to the failure to service borrower accounts in compliance with statutory or regulatory requirements, the terms of the Servicing Contract, or Department of Education guidance.

318. At all relevant times, Plaintiffs and class members entered into Master Promissory Notes (MPNs) with the Department of Education for the issuance and repayment of federally held student loans. Among other things, the MPNs required the Department of Education to service Plaintiffs' loans and the loans of class members in accordance with federal law. The MPNs also stated that the Department of Education may contract with loan servicers to process student loan payments, deferment and forbearance requests, and other transactions, and to

answer questions about those loans.

319.    At all relevant times, MOHELA acted as a loan servicer for Plaintiffs' and class members' student loans, pursuant to an assignment or delegation of loan servicing rights and obligations from the Department of Education. Specifically, by entering into the Servicing Contracts with the Department of Education, MOHELA accepted assignment of loan servicing rights and obligations set forth in the Master Promissory Notes and thus became an assignee thereof. Thus, at all relevant times, Plaintiffs and class members were in a contractual relationship with MOHELA, as assignee under the Master Promissory Notes.

320.    As an assignee of the Department of Education under the Master Promissory Notes, MOHELA assumed the Department of Education's contractual obligations to Plaintiffs and class members, including but not limited to the obligation to service the loan in accordance with governing laws and regulations, as well as the terms of the Master Promissory Notes.

321.    At all relevant times, Plaintiffs and class members performed all, or materially all, obligations imposed on them, if any, under the Servicing Contracts and the Master Promissory Notes, or such obligations have been waived.

322.    As set forth above, MOHELA materially breached the Servicing Contracts and the Master Promissory Notes by failing to administer each of Plaintiffs' loans and the loans of class members in accord with federal law. Specifically, for borrowers with loans on the SAVE plan as of July 18, 2024, MOHELA failed to place those loans in interest-free forbearance during the period July 18, 2024 through July 31, 2025, as was required by federal law and the Department's guidance, in violation of the terms of the Servicing Contracts and the Master Promissory Notes.

323.    As a direct and proximate result of MOHELA's breaches of the Servicing

Contracts and the Master Promissory Notes, Plaintiffs and class members have suffered damages.

**FOURTH CLAIM FOR RELIEF**
**(Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*, on Behalf of Plaintiff Hart and the Florida Application Processing Subclass)**

324.    Plaintiffs restate and incorporate by reference the allegations in all paragraphs above as though fully set forth herein.

325.    Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Fla. Stat. § 501.204(1).

326.    As a "person, firm, corporation, association, or entity," MOHELA is subject to the provisions of FDUTPA. Fla. Stat. § 501.2075.

327.    In the course of its business, and during the relevant period, MOHELA committed the following deceptive acts or practices, in the conduct of MOHELA's business, trade, or commerce, in violation of FDUTPA § 501.204(1):

a.    Failure to process applications for the SAVE plan within 60 days;

b.    Failure to place SAVE applicants' loans into either processing forbearance of general administrative forbearance during Days 1 through 60 of the application being in process;

c.    Failure to place SAVE applicants' loans into general administrative forbearance when their SAVE applications remained unprocessed after 60 days; and

d.    Wrongful acceptance of continued payments and accrual of interest after the expiration of the 60-day processing period.

328.    MOHELA's methods, acts, and practices injured the consuming public and

- 70 -

legitimate business enterprises.

329.    As a direct and proximate result of MOHELA's deceptive and unfair practices,

Plaintiff Hart and members of this subclass suffered damages.

330.    MOHELA knew or should have known that its conduct was unfair or deceptive.

**FIFTH CLAIM FOR RELIEF**
**(Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et***
***seq.*, on Behalf of Plaintiff Hart and the Florida Post-Stay Interest Subclass)**

331.    Plaintiffs restate and incorporate by reference the allegations in all paragraphs

above as though fully set forth herein.

332.    Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits

"[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts

or practices in the conduct of any trade or commerce . . . ." Fla. Stat. § 501.204(1).

333.    As a "person, firm, corporation, association, or entity," MOHELA is subject to

the provisions of FDUTPA. Fla. Stat. § 501.2075.

334.    In the course of its business, and during the relevant period, MOHELA committed

the following deceptive acts or practices, in the conduct of MOHELA's business, trade, or

commerce, in violation of FDUTPA § 501.204(1):

a.    Failure to place SAVE plan loans in interest-free forbearance during the period

July 18, 2024 through July 31, 2025.

335.    MOHELA's methods, acts, and practices injured the consuming public and

legitimate business enterprises.

336.    As a direct and proximate result of MOHELA's deceptive and unfair practices,

Plaintiff Hart and members of this subclass suffered damages.

337.    MOHELA knew or should have known that its conduct was unfair or deceptive.

**SIXTH CLAIM FOR RELIEF**
**(Violation of the New York General Business Law, N.Y. GBL § 349, on Behalf of Plaintiff**
**Sprogis and the New York SAVE Benefits Subclass)**

338.    Plaintiffs restate and incorporate by reference the allegations in all paragraphs above as though fully set forth herein.

339.    New York's General Business Law (GBL) § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce . . . ."

340.    In the course of its business, and during the relevant period, MOHELA committed the following deceptive acts or practices, in the conduct of MOHELA's business, trade, or commerce, in violation of GBL § 349:

    a.    Failure to automatically provide borrowers that were previously enrolled in a REPAYE plan with the benefits of the SAVE plan starting on July 30, 2023.

341.    MOHELA engaged in this conduct because it increased MOHELA's revenue, including through additional monthly servicing fees as well as increased collection fees for defaulted student loans.

342.    Because MOHELA's deception takes place within the context of federal student loan programs, it affects the public interest. Further, MOHELA's unlawful conduct constitutes unfair acts or practices that have the capacity to deceive consumers, and that have a broad impact on consumers at large.

343.    As a direct and proximate result of MOHELA's deceptive acts or practices, Plaintiff Sprogis and members of this subclass have suffered damages.

**SEVENTH CLAIM FOR RELIEF**
**(Violation of the New York General Business Law, N.Y. GBL § 349, on Behalf of Plaintiff**
**Sprogis and the New York Post-Stay Interest Subclass)**

344.    Plaintiffs restate and incorporate by reference the allegations in all paragraphs above as though fully set forth herein.

- 72 -

345.     New York's General Business Law (GBL) § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce . . . ."

346.     In the course of its business, and during the relevant period, MOHELA committed the following deceptive acts or practices, in the conduct of MOHELA's business, trade, or commerce, in violation of GBL § 349:

a.     Failure to place SAVE plan loans in interest-free forbearance during the period July 18, 2024 through July 31, 2025.

347.     MOHELA engaged in this conduct because it increased MOHELA's revenue, including through additional monthly servicing fees as well as increased collection fees for defaulted student loans.

348.     Because MOHELA's deception takes place within the context of federal student loan programs, it affects the public interest. Further, MOHELA's unlawful conduct constitutes unfair acts or practices that have the capacity to deceive consumers, and that have a broad impact on consumers at large.

349.     As a direct and proximate result of MOHELA's deceptive acts or practices, Plaintiff Sprogis and members of this subclass have suffered damages.

## EIGHTH CLAIM FOR RELIEF
### (Violation of the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020, on Behalf of Plaintiff Lehman and the Washington SAVE Benefits Subclass)

350.     Plaintiffs restate and incorporate by reference the allegations in all paragraphs above as though fully set forth herein.

351.     Washington's Consumer Protection Act ("WCPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Wash. Rev. Code § 19.86.020.

352. Through its business activity, MOHELA engages in trade or commerce. Wash. Rev. Code § 19.86.010(2).

353. In the course of its business, and during the relevant period, MOHELA committed the following deceptive acts or practices, in the conduct of MOHELA's business, trade, or commerce, in violation of Wash. Rev. Code § 19.86.020:

a. Failure to automatically provide borrowers that were previously enrolled in a REPAYE plan with the benefits of the SAVE plan starting on July 30, 2023.

354. Because MOHELA's deception takes place within the context of federal student loan programs, it affects the public interest. Further, MOHELA's unlawful conduct constitutes unfair acts or practices that did injure or have the capacity to injure other persons.

355. As a direct and proximate result of MOHELA's deceptive acts or practices, Plaintiff Lehman and members of this subclass have suffered damages.

356. MOHELA's unlawful acts and practices justify the imposition of treble damages.

### NINTH CLAIM FOR RELIEF
**(Violation of the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020, on Behalf of Plaintiff Lehman and the Washington Application Processing Subclass)**

357. Plaintiffs restate and incorporate by reference the allegations in all paragraphs above as though fully set forth herein.

358. Washington's Consumer Protection Act ("WCPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.

359. Through its business activity, MOHELA engages in trade or commerce . . . . Wash. Rev. Code § 19.86.010(2).

360. In the course of its business, and during the relevant period, MOHELA committed

the following deceptive acts or practices, in the conduct of MOHELA's business, trade, or commerce, in violation of Wash. Rev. Code § 19.86.020:

    a.     Failure to process applications for the SAVE plan within 60 days;

    b.     Failure to place SAVE applicants' loans into either processing forbearance of general administrative forbearance during Days 1 through 60 of the application being in process;

    c.     Failure to place SAVE applicants' loans into general administrative forbearance when their SAVE applications remained unprocessed after 60 days; and

    d.     Wrongful acceptance of continued payments and accrual of interest after the expiration of the 60-day processing period.

361.    Because MOHELA's deception takes place within the context of federal student loan programs, it affects the public interest. Further, MOHELA's unlawful conduct constitutes unfair acts or practices that did injure or have the capacity to injure other persons.

362.    As a direct and proximate result of MOHELA's deceptive acts or practices, Plaintiff Lehman and members of this subclass have suffered damages.

363.    MOHELA's unlawful acts and practices justify the imposition of treble damages.

**TENTH CLAIM FOR RELIEF**
**(Violation of the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020, on Behalf of Plaintiff Lehman and the Washington Post-Stay Interest Subclass)**

364.    Plaintiffs restate and incorporate by reference the allegations in all paragraphs above as though fully set forth herein.

365.    Washington's Consumer Protection Act ("WCPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Wash. Rev. Code § 19.86.020.

366. Through its business activity, MOHELA engages in trade or commerce. Wash. Rev. Code § 19.86.010(2).

367. In the course of its business, and during the relevant period, MOHELA committed the following deceptive acts or practices, in the conduct of MOHELA's business, trade, or commerce, in violation of Wash. Rev. Code § 19.86.020:

    a. Failure to place SAVE plan loans in interest-free forbearance during the period July 18, 2024 through July 31, 2025.

368. Because MOHELA's deception takes place within the context of federal student loan programs, it affects the public interest. Further, MOHELA's unlawful conduct constitutes unfair acts or practices that did injure or have the capacity to injure other persons.

369. As a direct and proximate result of MOHELA's deceptive acts or practices, Plaintiff Lehman and members of this subclass have suffered damages.

370. MOHELA's unlawful acts and practices justify the imposition of treble damages.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

    a. Certify each of the proposed classes and subclasses pursuant to Rule 23 of the Federal Rules of Civil Procedure, designating Plaintiffs class and subclass representatives and designating the undersigned as Class Counsel;

    b. Award damages to Plaintiffs and class and subclass members, in an amount to be proven at trial, including interest thereon;

    c. Award treble, punitive and exemplary damages to Plaintiffs and class and subclass members, as permitted by law;

    d. Order specific performance;

   e.  Permanently enjoin MOHELA from continuing to engage in the legal violations alleged herein;

   f.  Award equitable relief, including an accounting, restitution, and disgorgement of all revenues, earnings, profits, and ill-gotten gains that MOHELA obtained as a result of its unlawful, unfair, or deceptive business practices, in an amount to be proven at trial;

   g.  Enter judgment in favor of Plaintiffs and class members against MOHELA;

   h.  Award attorneys' fees and costs, as allowed by law;

   i.  Award pre-judgment and post-judgment interest, as provided by law; and

   j.  Award such other, further, and different relief as the Court deems proper under the circumstances.

## IX. JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Local Rule 2.04, Plaintiffs demand a trial by jury of all issues so triable.

Dated:  January 8, 2026

PAUL LLP
/s/  *Richard M. Paul III*
Richard M. Paul III, 44233 (EDMO)
Megan M. Duffield, 76886 (MO)
600 Broadway Boulevard, Suite 600
Kansas City, Missouri 64105
Telephone: (816) 984-8100
Rick@PaulLLP.com
Megan@PaulLLP.com

BERMAN TABACCO
Nathaniel L. Orenstein, BBO #664513
(MA) (*pro hac vice* forthcoming)
Justin N. Saif, BBO #660679 (MA) (*pro hac vice* forthcoming)
One Liberty Square
Boston, MA 02109
Telephone:  617.542.8300
norenstein@bermantabacco.com
jsaif@bermantabacco.com

Caitlyn M. Barresi, 357977 (CA) (*pro hac vice* forthcoming)
425 California Street, Suite 2300
San Francisco, CA  94104
Telephone:  415.433.3200
cbarresi@bermantabacco.com

Respectfully submitted,

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
Roger N. Heller, SBN 215348 (CA) (*pro hac vice* forthcoming)
Katherine Lubin Benson, SBN 259826 (CA) (*pro hac vice* forthcoming)
Michael K. Sheen, SBN 288284 (CA) (*pro hac vice* forthcoming)
Annie M. Wanless, SBN 339635 (CA) (*pro hac vice* forthcoming)
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
rheller@lchb.com
kbenson@lchb.com
msheen@lchb.com
awanless@lchb.com

***Attorneys for Plaintiffs***

- 78 -